Tiffany **MOSHER**, Appellee,

v.

**DEPARTMENT OF INSPECTIONS AND APPEALS, HEALTH FACILITIES DIVISION**, Appellant.

No. 02–1115.

Supreme Court of Iowa.

Nov. 13, 2003.

502

Thomas J. Miller, Attorney General, and Jean Davis and Melissa Anne Biederman, Assistant Attorneys General, for appellant.

Timothy L. Gartin and Mark A. Teigland of Hastings & Gartin, LLP, Ames, for appellee.

TERNUS, Justice.

The appellant, Department of Inspections and Appeals, found that the appellee, Tiffany Mosher, committed dependent adult abuse through the financial exploitation of an elderly person, J.B. *See* Iowa Code § 235B.2(5)(*a*)(1)(*c*) (1999). As a result of this administrative decision, Mosher was placed on the dependent adult abuse registry. *See generally id.* § 235B.5 (creating registry). Mosher successfully sought judicial review in the district court, which held in a thorough and considered decision that (1) the department incorrectly interpreted the term "dependent adult" as used in chapter 235B; and (2) the department's factual findings with respect to J.B.'s status as a "dependent adult" and Mosher's status as a "caretaker" during all relevant times were not supported by substantial evidence. The department appealed.

Upon our review of the record and the arguments of the parties, we agree with the ruling of the district court. Therefore, we affirm the district court's judgment reversing the agency decision and ordering the expungement of Mosher's name from the abuse registry.

### I. *Dependent Adult Abuse Statute.*

We begin our discussion of this appeal with a brief review of the pertinent statute. Iowa Code chapter 235B provides that the Department of Human Services (DHS) shall establish and operate a dependent adult abuse services program, emphasizing "the reporting and evaluation of cases of abuse of a dependent adult." *Id.* § 235B.1. Even though DHS is responsible for receiving and evaluating dependent adult abuse reports and for establishing a central registry for such information, "the department of inspections and appeals is solely responsible for the evaluation and disposition of dependent adult abuse cases

*within health care facilities." Id.* § 235B.3(1) (emphasis added).

Although dependent adult abuse can take many forms, the present case concerns only one, financial exploitation. That form of abuse is defined in chapter 235B as follows:

5. *a.* "*Dependent adult abuse*" means:

(1) Any of the following as a result of the willful or negligent acts or omissions of a *caretaker:*

. . . .

(*c*) Exploitation of a *dependent adult* which means the act or process of taking unfair advantage of a dependent adult or the adult's physical or financial resources for one's own personal or pecuniary profit, without the informed consent of the dependent adult, including theft, by the use of undue influence, harassment, duress, deception, false representation, or false pretense.

*Id.* § 235B.2(5)(*a*)(1)(*c*) (final two emphases added). A "caretaker" is defined in chapter 235B as

a related or nonrelated person who has the responsibility for the protection, care, or custody of a dependent adult as a result of assuming the responsibility voluntarily, by contract, through employment, or by order of the court.

*Id.* § 235B.2(1). A "dependent adult" for purposes of this chapter is

a person eighteen years of age or older who is unable to protect the person's own interests or unable to adequately perform or obtain services necessary to meet essential human needs, as a result of a physical or mental condition which requires assistance from another, or as defined by departmental rule.

*Id.* § 235B.2(4). References to "department" in chapter 235B mean DHS. *Id.* § 235B.2(3). DHS has adopted a rule de-

fining "dependent adult," but this rule is identical to the statutory definition. *See* Iowa Admin. Code r. 441–176.1. With this statutory framework in mind, we now review the events leading to the present appeal.

II. *Background Facts.*

In 1996 Tiffany Mosher was an administrator at a licensed nursing facility in Ames, Iowa. *See generally* Iowa Code ch. 135C (regulating the licensure of health care facilities). On June 6, 1996, J.B. and his wife of over fifty years were admitted to this establishment. At the time of their admission, J.B.'s wife was quite infirm, both mentally and physically, and J.B. was no longer able to care for her in their home. J.B., an eighty-three-year-old retired attorney, suffered from some chronic medical conditions, including atrial fibrillation, carotid vascular disease, and arthritis. He also had a history of laryngeal cancer. J.B. wore a condom catheter for occasional incontinence, but required no help with it. In addition, he used a cane, although he was able to ambulate without assistance from others.

J.B.'s medical conditions required that he take several medications on a daily basis. When J.B. initially came to the facility, he kept his medications in his room. Eventually, the facility staff volunteered to keep and dispense his medications for him, partly out of concern that other residents might have access to the medications. J.B. agreed to this suggestion and during the remainder of his time at the Ames facility, his medications were organized and dispensed by the facility staff.

The record shows J.B. was quite independent. Although he generally took his morning and evening meals at the facility, he usually spent the rest of the day outside of it, attending to his business and other interests. J.B. often went to Story City,

Iowa, where he maintained an office in the mobile home in which he and his wife had resided. He transported himself in his own car.

J.B. was somewhat aloof from the other facility residents, finding he had little in common with them, socially or intellectually. Nonetheless, he routinely helped organize a periodic "men's stag" at the facility. With the exception of a former daughter-in-law and grandson, J.B. did not have a close relationship with his family, including his children and stepdaughter. Although J.B.'s wife died in March 1997, J.B. continued to reside at the Ames facility.

In January 1998, notwithstanding the facility's written policy prohibiting the solicitation or acceptance of gifts from residents, Mosher spoke with J.B. about a loan for $13,000. Mosher told J.B. that she needed the money to pay on her high-interest student loans. J.B. agreed to loan Mosher the money and drafted a promissory note to document a six-month loan at 9% interest. At some point, J.B. became aware that Mosher had used some of the loan proceeds to pay credit card debt. When the note became due, Mosher was only able to pay the interest due, so J.B. extended the note for another six months.

In August 1998 Mosher left the Ames facility and became employed at a similar establishment in Zearing, Iowa. She continued, however, to visit J.B. periodically. In November 1998 J.B. left the Ames nursing facility against medical advice and moved back to his home in Story City. (The record is unclear why J.B.'s departure was against medical advice.) After J.B. returned to his home, Mosher visited him weekly and then, as time went on, more frequently. Mosher ran errands for J.B., helped him with cleaning and sorting things in his home, and assisted J.B. in obtaining an emergency system for his

home in case he fell and needed medical assistance. Around this time, Mosher introduced J.B. to a registered nurse, Selina Banda–Orman, who had also worked at the Ames care facility. J.B. employed Banda–Orman and also assisted her with her financial needs.

In January 1999 J.B. gifted the loan proceeds to Mosher and her husband by forgiving and canceling the promissory note. He structured this transaction as a gift to avoid unwanted tax consequences. Later that year J.B. started giving Mosher $700–$750 each month to pay on her student loans. Mosher received approximately $3600 before these payments ceased in January 2000. Bank records revealed that very little of this money actually went towards Mosher's student loans.

In November 1999 J.B. was admitted to Mill Pond Retirement Community, a licensed health care facility in Ankeny, Iowa. Shortly after his admission, J.B. gave Mosher a check for $18,500 to fund Mosher's purchase of a car. Within a month, J.B. transferred an additional $20,000 to Mosher to be used as a down payment on a house. In actuality, a portion of this money was spent on needs other than the purchase of a home.

In December 1999 J.B. left Mill Pond against medical advice and moved to an apartment in Des Moines with the help of Banda–Orman. Within a few hours, he fell, dislocating his hip, and was hospitalized in Ames. J.B. was treated for various conditions during his hospitalization, but was eventually discharged on January 6, 2000. Upon J.B.'s release from the hospital, he was admitted to a skilled nursing facility at Green Hills, Iowa. It was at about this same time that Mosher received the last $700 gift from J.B.

### III. *Underlying Proceedings.*

On January 5, 2000, the Department of Inspections and Appeals (hereinafter "DIA" or "department") received a letter from Robert Huffer, J.B.'s attorney, indicating Huffer's concern that Tiffany Mosher was taking advantage of J.B. Department staff, in association with Tom Noonan, an assistant attorney general, undertook an investigation. Noonan spoke with Huffer and learned that he was aware of financial transactions between J.B. and Mosher that Huffer thought inconsistent with J.B.'s frugal and conservative nature. Huffer was worried that Mosher had somehow intimidated or threatened J.B. to induce payments of money.

On January 18, 2000, Noonan interviewed J.B. Although J.B. was "generally affable, patient, and cooperative" during the interview, he clearly resented the intrusion into his affairs. He confirmed the chronology of events reviewed above and acknowledged that Huffer believed that he—J.B.—was being "railroaded by a couple of ambitious women," but that Huffer was wrong. J.B. asserted that his gifts to Mosher were "nobody else's business." He stated, "I've weighed tax consequences and I'm avoiding some estate taxes by making these gifts to [her]." J.B. justified his generosity to Mosher, stating she had been "extremely competent" and "extremely accommodating," and had been a very good friend to him. When asked whether his family should be concerned about his gifts to Mosher, J.B. revealed that his family would get nothing when he died. J.B. related that the only person in his family he ever respected was his father, and J.B. had made arrangements in his will for a memorial to his father at Iowa State University. J.B. also rejected the suggestion that he might run out of money, stating with a laugh, "Even after these gifts, I'll have a net worth of around $1,200,000 . . . don't worry, I won't run out of money!"

By the time of this interview, J.B. had fired Huffer as his attorney. Although J.B. was reluctant to discuss why he had discharged attorney Huffer, he eventually revealed that he wanted to get rid of Huffer because Huffer had "made trouble in the guise of guarding my interests as my power-of-attorney."

The investigation also included an interview of J.B.'s new attorney, Franklin Feilmeyer. Feilmeyer relayed to Noonan J.B.'s position that the money J.B. gave away was his, that he could do what he wanted with his money, and that it should be of no concern to anyone else. Noonan also spoke with J.B.'s long-time physician, Dr. Timothy Lowery, who described J.B. as "very independent and articulate" and "very mentally clear" despite his health concerns.

On May 19, 2000, DIA determined that Mosher had committed dependent adult abuse based upon financial exploitation of J.B. This conclusion was based on Mosher's acceptance of money from J.B. during and after her employment at the Ames health care facility.

Mosher requested an evidentiary hearing, which was held on December 5, 2000, before an administrative law judge (ALJ). DIA called as an expert witness Dr. Janet Specht, a nurse administrator who had served for many years as the director of nursing at the Iowa Veterans Home in Marshalltown. Based upon her review of the investigation and records from the various facilities where J.B. had resided, Dr. Specht concluded J.B. was dependent in terms of his emotional needs and his ability to get his medications together when he resided at the Ames facility. She thought Mosher used undue influence to obtain the initial loan. Dr. Specht expressed similar opinions concerning the later loans and gifts and J.B.'s dependency at that time.

DIA also called Kathy Sutton, a registered nurse and bureau chief in the department's long-term care bureau. When asked how the department defined "dependent adult," she responded, "Our definition of a dependent adult is anybody that lives in a licensed and certified health care facility." She testified that regardless of the person's abilities and mobility, "the fact that they are certified to need a level of nursing care provided by a caretaker puts them in dependent status." She acknowledged, however, that certification for admission simply meant "the resident requires no greater level of care than what that facility can provide." She also agreed a person might need less than the level of services that are offered at a particular facility, yet still be certified for that facility. Conceding that a nursing facility resident might be capable of obtaining food, shelter, and medical services on his or her own, she stated DIA would still consider such a person a dependent adult simply because the person lived in a nursing facility.

The agency's final witness was Noonan, the assistant attorney general who conducted the investigation. Noonan relayed the substance of his interviews of J.B., Huffer, and Feilmeyer. He also testified at length about how Mosher spent the funds given to her by J.B., noting many instances in which the funds were not used for the purposes represented by Mosher to J.B. Noonan also testified, based on his examination of Mosher's financial records, that she did not have the means to repay the initial loan within six months of its making.

Mosher then called her own expert witness, Dr. Robert Bender, a geriatrician who had examined J.B. in June 1999. Dr. Bender testified that J.B. was not suffering from any dementing illness, such as senile dementia or Alzheimer's, at the time

of his examination or at any point prior in time. Carolyn Hasbrook, a long-time friend of J.B., also testified. She denied that J.B. was emotionally vulnerable after his wife died. Finally, Mosher herself testified, confirming J.B.'s loans and gifts to her. Mosher asserted that her use of the money was in keeping with J.B.'s understanding and that she in no way misrepresented to him her intended use.

The ALJ entered a proposed decision on December 14, 2000. She concluded J.B. was a "dependent adult" within the meaning of the dependent adult abuse statute and rules "[b]y virtue of his status as a resident in a health care facility." She also pointed out that the Ames facility had dispensed J.B.'s medications and prepared meals for him. In addition, the ALJ concluded Mosher fit the definition of "caretaker" at all relevant times. Finally, the ALJ found that Mosher had "misrepresented her intentions" to J.B. and had financially exploited him. The ALJ proposed that Mosher be held to have committed dependent adult abuse by financial exploitation. This decision was adopted by the agency as its final decision on March 2, 2001.

Mosher filed a petition for judicial review. She alleged DIA had committed a legal error in equating residency in a health care facility with status as a dependent adult. She also contended the facts did not support a finding that J.B. was a dependent adult while at the Ames facility, or that she was J.B.'s "caretaker" after she left her job there. The district court agreed and reversed the agency decision.

DIA filed this appeal, raising three issues. First, it contends the district court erred in not concluding that all certified residents of licensed health care facilities who are eighteen years of age or older are "dependent adults" for purposes of dependent adult abuse investigations and dispositions conducted by DIA. Second, it argues the district court erred in concluding there was not substantial evidence to support the agency finding that J.B. was a "dependent adult" when he resided in Ames. Similarly, the department asserts the court erred in ruling there was not substantial evidence to support its finding that Mosher was a "caretaker" after she left her employment at the Ames nursing facility.

Before we address the merits of the issues raised on appeal, we must consider the agency's contention that it has discretion with respect to these matters under chapter 235B. Whether an agency has discretion with respect to a provision of law affects not only the level of deference to be accorded an agency's interpretation of the statutory provision, but also affects our standard of review. *See* Iowa Code § 17A.19(10)-(11) (2001).[1] Therefore, we

---

1. All references to chapter 17A, the Administrative Procedure Act, are to the 2001 Iowa Code, as our review of this action for judicial review is controlled by the 1998 amendments to chapter 17A, which first appeared in the 2001 edition of the Code. *See* 1998 Iowa Acts ch. 1202, § 46 (making 1998 amendments to chapter 17A applicable to all agency proceedings commenced after July 1, 1999); *Midwest Auto. III, LLC v. Iowa Dep't of Transp.*, 646 N.W.2d 417, 421 (Iowa 2002). All references to other statutory provisions are to the 1999 version of the Code. Although the events giving rise to this proceeding occurred from 1998 through 2000, the substantive law governing the issues in this case did not change from the 1997 Code to the 1999 Code. *See generally Bd. of Trustees v. City of West Des Moines*, 587 N.W.2d 227, 231 (Iowa 1998) ("Substantive law creates, defines, and regulates rights, while procedural law governs the practice, method, procedure, or legal machinery by which the substantive law is enforced or made effective."); *Berghammer v. Smith*, 185 N.W.2d 226, 236 (Iowa 1971) (Uhlenhopp, J., concurring in part and dissenting in part) (stating general rule that "the substan-

will first review the governing provisions of the Administrative Procedure Act and then decide what, if any, discretion has been given to DIA with respect to the matters under consideration in this appeal.

## IV. Scope and Standards of Review.

A. *General provisions.* We review district court decisions on judicial review of agency action under the standards of the Administrative Procedure Act, Iowa Code chapter 17A. *Locate.Plus.Com, Inc. v. Iowa Dep't of Transp.*, 650 N.W.2d 609, 612 (Iowa 2002). Applying these standards, we determine whether our conclusions are the same as those reached by the district court. *Id.* The agency decision itself is reviewed under the standards set forth in section 17A.19(10). *See Stone Container Corp. v. Castle*, 657 N.W.2d 485, 488 (Iowa 2003).

Pursuant to Iowa Code section 17A.19(10), a court must reverse agency action when any one of several enumerated circumstances exists and "substantial rights of the person seeking judicial relief have been prejudiced" as a result. *See* Iowa Code § 17A.19(10). The challenge to the agency decision in this case is grounded on two of these circumstances: (1) an asserted lack of evidentiary support for DIA's factual findings; and (2) an alleged error by DIA in interpreting the statutory definition of "dependent adult" set forth in section 235B.2(4). *See id.* § 17A.19(10)(c), (f), (l). There is no dispute that if either circumstance exists, Mosher's substantial rights have been prejudiced by the agency's action.

B. *Review of factual findings.* With respect to the claimed error in the agency's factual determinations, chapter 17A mandates reversal when the agency decision is "[b]ased upon a determination of

fact clearly vested by a provision of law in the discretion of the agency that is not supported by substantial evidence in the record before the court when that record is viewed as a whole...." *Id.* § 17A.19(10)(f); *see also IBP, Inc. v. Harpole*, 621 N.W.2d 410, 414 (Iowa 2001) (noting court is bound by the agency's factual findings if they are supported by substantial evidence in the record). There is no dispute that the determination of whether dependent adult abuse has in fact occurred is the responsibility of DIA when, as here, the alleged abuse occurs within a health care facility. *See* Iowa Code § 235B.3(1).

The legislature has provided that "substantial evidence"

means the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance.

*Id.* § 17A.19(10)(f)(1). " 'An agency's decision does not lack substantial evidence because inconsistent conclusions may be drawn from the same evidence.' " *Harpole*, 621 N.W.2d at 418 (citation omitted). The adequacy of the evidence must, however, be viewed "in light of all the relevant evidence in the record cited by any party that detracts from that finding as well as all of the relevant evidence in the record cited by any party that supports it." Iowa Code § 17A.19(10)(f)(3).

C. *Issues of statutory interpretation.* Our review of DIA's interpretation of chapter 235B depends on whether the interpretation of the statutory provision at issue has "clearly been vested by a provision of law in the discretion of the agency."

tive law as of the time of an occurrence is

applied to that occurrence").

*Id.* § 17A.19(10)(*c*). If such discretion has not clearly been vested in DIA, we will reverse the agency decision if it is based on "an erroneous interpretation" of the law. *Id.* In contrast, if the legislature has vested the department with discretion to interpret a particular provision of law, we will reverse the agency's decision resting on that interpretation only when the interpretation is "irrational, illogical, or wholly unjustifiable." *Id.* § 17A.19(10)(*l*); *see also Locate.Plus.Com, Inc.*, 650 N.W.2d at 613 (stating statutory interpretation is normally a judicial function, except when the legislature has "clearly" delegated the authority to interpret a statute to an agency). In deciding whether there has been a clear delegation of discretion, we find helpful the following comments concerning the meaning of "clearly" as used in section 17A.19(10):

> [The word "clearly"] means that the reviewing court, using its own independent judgment and without any required deference to the agency's view, must have a firm conviction from reviewing the precise language of the statute, its context, the purpose of the statute, and the practical considerations involved, that the legislature actually intended (or would have intended had it thought about the question) to delegate to the agency interpretive power with the binding force of law over the elaboration of the provision in question.

Arthur E. Bonfield, *Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 63 (1998) [hereinafter "Bonfield"]. With this analytical framework in mind, we consider whether DIA has been granted the discretion to interpret or elaborate the definitions contained in section 235B.2.·

DIA argues it has been granted discretion to interpret the statutory definitions set forth in chapter 235B for two reasons: (1) it has broad regulatory authority over licensed health care facilities pursuant to Iowa Code chapter 135C; and (2) section 235B.3(1) places responsibility for "the evaluation and disposition of dependent adult ,abuse cases within health care facilities" on DIA. In considering DIA's contention, we give no deference to its view that it has been accorded discretion in this area. *See* Iowa Code § 17A.19(11)(*a*).

Clearly, DIA's general regulatory authority over health care facilities under chapter 135C does not qualify as a legislative delegation of discretion to DIA with respect to the particular matter of dependent adult abuse under chapter 235B, especially in view of DHS's general authority over dependent adult abuse. *See id.* § 235B.1 (giving authority to DHS to operate dependent adult abuse services program, including reporting and evaluation of cases of abuse). Thus, if DIA has discretion it must flow from its responsibility to investigate and evaluate charges of abuse in health care facilities. *See id.* § 235B.3(1). But we think this general duty merely vests discretion in DIA to make a *factual* determination in a particular class of cases: whether dependent adult abuse has occurred in a health care facility.

Neither the language of section 235B.3(1) nor its context or purpose creates a firm·conviction in this court that DIA's responsibility includes the power to interpret the chapter 235B definitions with the "binding force of law." *See* Bonfield at 63. In fact, we are firmly convinced that the legislature did not intend DIA to have this power. First, it would be inconsistent with the statutory scheme placing overall responsibility for dependent adult abuse on DHS to give DIA the discretion to interpret the statute. Even more pertinent to the present case is the fact the

legislature expressly granted DHS the discretion to elaborate on the statutory definition of "dependent adult" found in chapter 235B. *See* Iowa Code § 235B.2(4) (giving detailed definition of the term "dependent adult" and then including the alternative "or as defined by departmental rule," referring to DHS); *see also id.* § 235B.2(3) (" 'Department' means the department of human services."). Because DHS, not DIA, clearly has discretion to interpret this particular provision, it would be contrary to the language of the statute for this court to hold that DIA has the discretion to elaborate on the statutory definition of this term.

In summary, we hold DIA has not been vested by a provision of law with discretion to interpret any provision of chapter 235B. Its only discretion is to make the factual determination of whether dependent adult abuse has occurred in a health care facility. Consequently, we will review DIA's interpretation of chapter 235B for correction of errors of law and not under the more deferential standard permitting reversal only where the agency's interpretation is "irrational, illogical, or wholly unjustifiable." *See id.* § 17A.19(10)(*c* ), (*l* ).

D. *Deference to agency interpretation.* A related matter concerns the level of deference we should give to DIA's interpretation of chapter 235B as this court determines the meaning of the statutory definitions. DIA argues that its interpretation of these definitions should be accorded *some* deference, even if this court concludes DIA has not been vested with discretion on these matters. Section 17A.19(11)(*b* ) addresses this issue. To fully understand this provision, however, it is important to consider it in the context of the entire subsection. Section 17A.19(11) provides that a court

    *a.* *Shall* not give any deference to the view of the agency with respect to whether particular matters have been vested by a provision of law in the discretion of the agency.

    *b.* *Should* not give any deference to the view of the agency with respect to particular matters that have not been vested by a provision of law in the discretion of the agency.

    *c.* *Shall* give appropriate deference to the view of the agency with respect to particular matters that have been vested by a provision of law in the discretion of the agency.

*Id.* § 17A.19(11) (emphasis added).

DIA argues the legislature's use of the word "should" in paragraph (*b* ), as opposed to "shall," indicates a court is not entirely prohibited from giving some deference to the agency even with respect to matters not vested in the agency's discretion. The distinction intended by the legislature's use of these different terms has been explained as follows:

[T]he "should not" language of paragraph (*b* ) clearly permits a reviewing court in some rare cases to voluntarily give whatever weight it thinks appropriate to the agency view, even though it generally urges courts to give no deference to the agency's view of the matter because the matter was not vested in agency discretion. The reason for this difference is wholly practical. There will inevitably be some situations in which the matters being reviewed that have not been vested in agency discretion are highly technical, requiring special expertness for adequate comprehension, and the agency has that expertness and the court does not. In those situations the reviewing court may feel that it must give some special weight to the agency's view in order to make a sound decision.

Bonfield at 72.

    ■ We do not think this appeal is one of those rare cases in which we should

ignore the legislature's general directive to give no deference to the agency's view in matters not involving agency discretion. The statutory definitions are clear and detailed. They are not "highly technical," and do not require "special expertness for adequate comprehension." Therefore, we give no deference to the agency's view on the issue of statutory interpretation. *Cf. Harrison v. Employment Appeal Bd.*, 659 N.W.2d 581, 586 (Iowa 2003) (giving no deference to Employment Appeal Board's interpretation of workplace drug testing law). We now consider the validity of DIA's finding that Mosher qualified as a "caretaker" during the time of the financial transactions between her and J.B.

## V. *Agency Finding That Mosher Was a "Caretaker."*

As indicated above, DIA found that Mosher was a "caretaker" at all relevant times. On judicial review, the district court determined there was substantial evidence to support a finding that Mosher was a caretaker when she worked at the Ames facility, but not after her employment there ceased. DIA challenges the latter conclusion. Upon our review of the record, we agree with the district court's assessment of the evidence.

DIA characterized Mosher as a "voluntary caretaker" after August 1998, when Mosher left the Ames nursing facility where J.B. resided. The statutory definition of "caretaker" includes a person who voluntarily assumes "responsibility for the protection, care, or custody of a dependent adult." Iowa Code § 235B.2(1). The issue for our consideration, then, is whether there is substantial evidence that Mosher voluntarily assumed the responsibility for J.B.'s protection, care, or custody from August 1998 through the date of the last gift, January 2000.

The record reveals that after J.B. moved out of the Ames facility in November 1998, Mosher helped J.B. in sorting through his things, ran some errands for him from time to time, and assisted him in obtaining an emergency system for his home in case he fell. We do not think Mosher's periodic visits and her willingness to help out can alone support a finding that she took it upon herself or otherwise had any moral or legal obligation or duty to provide for J.B.'s protection, care, or custody. *See generally Webster's Third New International Dictionary* 133 (unabr. ed.2002) (defining "assume"); *id.* at 1935 (defining "responsibility" and "responsible"). During most of the time in question, other persons were being paid to provide for J.B.'s protection, care, and custody. The evidence does not show Mosher assumed responsibility for these matters.

We note the department makes only a minimal effort in its brief to marshal evidence that Mosher functioned as a caretaker for J.B. after she left the Ames facility. Rather, DIA simply argues that "Mosher was a caretaker at the time [the] exploitation started" and that all her actions should "be considered a pattern stemming from her initial caretaker relationship with J.B."

We reject DIA's apparent argument—once a caretaker, always a caretaker—because its rests on a misunderstanding of the requirements for a finding of dependent adult abuse. While it is not necessary to examine each financial transaction between Mosher and J.B. in isolation, the requisite elements of exploitation of a "dependent adult" by a "caretaker" must be present at the time of the specific act providing a basis for DIA's determination that Mosher committed "dependent adult abuse." *See* Iowa Code § 235B.2(5)(*a*)(1)(*c*) (defining "dependent adult abuse," in part, as the "[e]xploitation

of a dependent adult" resulting from "the willful or negligent acts or omissions *of a caretaker*" (emphasis added)). Thus, to the extent DIA's determination that Mosher committed dependent adult abuse rests on her actions after August 1998, there must be substantial evidence that Mosher continued to meet the definition of a "caretaker" after that date. As we have already discussed, such evidence is lacking here.

In summary, we hold there is not substantial evidence to support the agency determination that Mosher committed dependent adult abuse after she left her employment at the Ames facility in August 1998 because Mosher no longer functioned as J.B.'s caretaker after that date. We next examine whether DIA's determination that J.B. was a dependent adult prior to August 1998, when Mosher did serve as his caretaker, is correct.

### VI. *Agency Finding That J.B. Was a Dependent Adult.*

In view of our determination that Mosher did not act as a caretaker after August 1998, we limit our discussion of J.B.'s dependency to evidence of his condition prior to that date. Our focus, therefore, is on January 1998, when Mosher first received money from J.B., through July 1998, when the original promissory note was extended for six months.

As noted earlier in our opinion, a "dependent adult" is one who is "unable to protect [his] own interests or unable to adequately perform or obtain services necessary to meet essential human needs, as a result of a physical or mental condition which requires assistance from another." *Id.* § 235B.2(4). DIA concluded J.B. was a dependent adult in 1998 because he was certified for a licensed health care facility. The agency also relied on evidence that the staff at the Ames facility managed J.B.'s medications and prepared meals for J.B., as well as expert testimony addressing this issue. We discuss each matter separately.

A. *Residency in a licensed health care facility.* DIA has a long-standing interpretation of the term "dependent adult" that includes all adult residents of licensed health care facilities. Although this interpretation is not embodied in an administrative rule, DIA relies on the various laws governing health care facilities to justify its interpretation. Thus, we examine those laws.

A "health care facility" includes a "nursing facility." *Id.* § 135C.1(6). (The Ames establishment in which J.B. resided was a "nursing facility.") A "nursing facility" is an institution that provides "health-related care and services . . . for a period exceeding twenty-four consecutive hours for individuals who, because of a mental or physical condition, *require nursing care and other services* in addition to room and board." *Id.* § 135C.1(13) (emphasis added).

DIA contends that anyone admitted to a nursing facility is a "dependent adult" because they "require nursing care and other services." But this conclusion is not necessarily true. The express statutory requirements for *admission* to a health care facility merely mandate that a facility not admit or retain a resident "[w]ho is in need of medical procedures, as determined by a physician, or services *which cannot be or are not being carried out in the facility.*" *Id.* § 135C.23(2)(*d*) (emphasis added). The certification requirements for admission to a nursing facility reflect this focus:

An admission to the nursing facility must be based on a physician's written order certifying that the individual being admitted requires *no greater degree* of nursing care than the facility to which

the admission is made is licensed to provide and is capable of providing.

*Id.* § 135C.3(1) (emphasis added); *accord* Iowa Admin. Code r. 481–58.14(7) (DIA rule mirroring certification requirement stated in section 135C.3(1)). Thus, an individual certified for admission to a nursing facility does not necessarily *require* nursing care. Certification for admission to a nursing facility merely means the individual requires no greater care than what this type of facility can provide.

DIA also relies on DHS rules promulgated pursuant to Iowa Code chapter 249A, which is the statute governing state assistance in paying the costs of medical care and services.[2] *See* Iowa Code §§ 249A.2(1), .3. In one of these rules, DHS defines "abuse" to include the exploitation of a "resident" by "a nursing facility employee." Iowa Admin. Code r. 441–81.1. DIA argues this definition implies that DHS also equates residency in a nursing facility to status as a dependent adult. But DHS's own definition of "dependent adult" in the rules implementing chapter 235B belies this inference. In Iowa Administrative Code rule 441–176.1, DHS defines "dependent adult" exactly as it is defined by the legislature in section 235B.2(4). Undoubtedly, this express definition controls over an inference found in rules implementing a different code chapter addressing financial assistance for medical care.

There is one additional aspect of the financial assistance rules that warrants discussion. That aspect is the certification required to obtain payment for nursing facility care, a subject DIA repeatedly references in its brief. As noted, chapter 249A deals with financial assistance and therefore is primarily focused on ensuring that residents need the level of care provided by a nursing facility before financial aid will be approved. Thus, the administrative rules implementing chapter 249A provide:

> Need for nursing facility care. Residents of nursing facilities must be in need of either nursing facility care or skilled nursing care. Payment will be made for nursing facility care residents only upon *certification of the need for the level of care* by a licensed physician of medicine or osteopathy and approval of the level of care by the department [of human services].

Iowa Admin. Code. r. 441–81.3(1) (emphasis added).

The certification of *need* required for public assistance provides some support for the proposition that any nursing facility resident *receiving public assistance in meeting the cost of nursing facility care* falls within the definition of "dependent adult." But when the resident does not receive public assistance, one cannot automatically conclude that such a resident is a dependent adult. Such residents are not certified to need nursing facility care under chapter 249A and rule 441–81.3(1), but rather are merely certified under section 135C.3(1) as needing no greater level of care than that provided by the facility. Thus, it is quite possible that residents merely certified for admission under chapter 135C do not "require nursing care" and are not "dependent adults."

J.B. serves as a good example of the distinction between residents receiving public assistance and private-pay residents. J.B., who had a successful career as a patent attorney, was quite well off

---

**2.** The department also cites to similar federal regulations governing grants to states for medical assistance programs. We think these regulations are not on point for the same reasons discussed with respect to the state rules on medical assistance. Consequently, we will not separately consider and discuss the federal regulations.

financially and paid for the cost of the Ames nursing facility for his wife and for himself. Consequently, it would not have been necessary for J.B. to obtain a certification that he needed the level of care provided by the nursing facility, as required for the receipt of financial assistance under chapter 249A. The only physician's certification required by J.B. was the certification needed for admission as mandated by section 135C.3(1), stating he required no greater level of care than what could be provided by the facility.[3] Thus, J.B.'s residency in a licensed nursing facility did not necessarily indicate that he needed the level of care offered by the facility.

■ In conclusion, we hold the agency erred in interpreting the definition of "dependent adult" to include all residents of nursing facilities. While such a conclusion might be justified as to those residents receiving assistance under chapter 249A, an issue we do not decide, it is clearly unwarranted as applied to residents, such as J.B., who pay the costs of the facility themselves.

We now consider whether the record otherwise provides substantial support for DIA's finding that J.B. was a dependent adult when he resided at the Ames facility and loaned Mosher $13,000. This inquiry requires a closer scrutiny of the factual record.

■ B. *Evidence of dependent adult status.* In arguing there was substantial evidence that J.B. was a "dependent adult," the State relies primarily on two points: (1) Dr. Lowery's certification for J.B.'s admission to the Ames facility; and (2) the expert testimony of Dr. Specht, the nurse administrator. We do not think Dr. Lowery's certification provides support for the agency's determination that J.B. was a "dependent adult" during his time at the Ames facility. As we have already pointed out, the chapter 135C certification merely verifies that the resident needs no greater care than that provided by the facility. Therefore, J.B.'s certification is not really probative of the factual matter at issue here: whether J.B. *required* the assistance of others, due to a physical or mental condition, to protect his interests or to adequately obtain services necessary to meet his essential human needs. *See* Iowa Code § 235B.2(4) (defining "dependent adult").

We turn now to Dr. Specht's testimony. Although Dr. Specht never met J.B., she had reviewed DIA's investigative file and the facility's records. She testified that in her opinion J.B. was dependent, and during the course of her testimony she offered several reasons for this opinion: (1) J.B. was certified for admission to the nursing facility; (2) J.B. could not independently manage his "pretty complex medication regimen"; and (3) J.B. was "fairly dependent . . . in terms of his emotional needs." Dr. Specht acknowledged, however, that with the exception of his medications, J.B. was able to obtain or arrange for his own food, shelter and medical care.

In considering the quality of this evidence, we first note that to the extent Dr. Specht's opinion rests on J.B.'s certification for admission under chapter 135C, it does not support a reasonable belief that J.B. was dependent. As we have repeatedly pointed out, this certification does not address the essential component of *need* for a certain level of assistance, which

---

**3.** Although the parties apparently agree Dr. Lowery certified J.B. and his wife when they moved into the Ames nursing facility, we cannot locate the actual certification in the record. Therefore, we are guided by the statutory requirements in concluding J.B.'s certification was only that required for admission to the facility under chapter 135C.

is critical to a determination of dependency. Thus, we focus our review on the other bases for this expert's opinion.

Our review of the record does not reveal evidentiary support for the witness's conclusion that J.B. required the assistance of the facility staff in managing his medications *due to "a physical or mental condition,"* a necessary element of dependency under the statutory definition of "dependent adult." *See id.* (emphasis added). The only person who testified concerning this arrangement was Mosher, who said the staff undertook this responsibility to avoid any problems with having unsupervised medications accessible to other residents and because it would be easier for J.B. Even though the agency was not required to accept Mosher's testimony as true, our review of the record fails to reveal substantial evidence to support a finding contrary to Mosher's explanation for staff management of J.B.'s medications.

There is no evidence J.B. was *physically* unable to manage and administer his medications. Although the records document that J.B. declined to self-administer his medications, his chart states he "may self-administer meds after nurse sets up." In fact, on the occasions when J.B. was away from the facility overnight, he took the necessary supply of medication with him and dispensed and took it by himself.

The evidence is equally strong that J.B. suffered from no *mental* condition that would interfere with his ability to manage and administer his own medications. Dr. Specht, DIA's own expert, testified that J.B. "did not have impaired cognition" and his mental status was such that he was able "to think and to make decisions." In addition, investigator Noonan noted in his report that as of September 9, 1998, J.B. "had no memory problems," "was independent in daily decision making," and "was

generally alert and oriented." J.B.'s physician, Dr. Lowery, also told Noonan that J.B. was "very mentally clear" as late as January 2000, although J.B. had experienced some periods of confusion during his hospitalization in December 1999. In addition, Dr. Bender, the geriatric physician who evaluated J.B. in the summer of 1999, testified that J.B. had a perfect score on a standardized test that assesses an individual's thinking ability. This witness testified further that J.B. suffered from no dementing illnesses at the time of his examination in 1999. According to Dr. Bender, such illnesses are not curable and therefore the absence of such an illness in 1999 indicated that no such illness was present in 1998 either.

We conclude from our review of the entire record that there is not substantial evidence to establish that J.B. was unable to manage his medications due to "a physical or mental condition." To the contrary, it appears staff assistance was forthcoming due to the complexity of J.B.'s medication regimen, a matter that would be problematic for a patient of any age and condition. In addition, regardless of the reason for assistance, it is undisputed J.B. was able to arrange for any help he thought he needed and that fact precludes a finding of dependency based on the aid he received with his medications. *See id.* § 235B.2(4) (defining "dependent adult" as someone who is "unable to adequately perform *or obtain* services necessary to meet essential human needs" (emphasis added)).

We hold J.B.'s decision to leave his medications with the staff, whether motivated by the complexity of the regimen or convenience, does not render him a dependent adult within the statutory definition. Thus, to the extent Dr. Specht's opinion of dependency rests on J.B.'s acceptance of help with his medications, her opinion would not "be deemed sufficient by a neu-

tral, detached, and reasonable person" to establish that J.B. could not "adequately perform or obtain services necessary to meet [his] essential human needs, as a result of a physical or mental condition."

The only other ground for Dr. Specht's opinion that J.B. was a dependent adult is her conclusion that J.B. was dependent for his emotional needs. In reviewing Dr. Specht's testimony, it appears her opinion was based on the death of J.B.'s wife and J.B.'s lack of close friends and family. To evaluate whether this testimony is of the quality and quantity sufficient to establish that J.B. was unable to protect his own interests or unable to meet his essential needs, we consider evidence that detracts from the agency's finding of emotional dependency, as well as evidence that supports it, as required by the standards governing judicial review of agency action. *See id.* § 17A.19(10)(*f*)(3). Again, we focus on the period during which Mosher worked at the Ames facility.

J.B.'s wife died in March 1997. The facility staff made the following comment on March 26, 1997: "[J.B.'s] wife passed away this quarter. He is handling it well. [He] continues to go out daily and work in his office." Notations made in September 1997 state that J.B. "remains extremely independent," continues to spend the majority of his time outside the facility, and "is doing very well at this time." Three months later, in December 1997, the staff notes that J.B. still leaves the facility each day in his own vehicle and "has strong community support." The remarks for this month include the following: "He keeps in close touch with some of his family members and not others. [J.B.] remains very friendly and has a great sense of humor. He is somewhat stressed about settling some financial problems but his attitude remains positive." Similar comments are made on March 12, 1998: "He is

very friendly and likes to talk/joke with staff and familiar residents." Another entry that month includes the fact that he had been sick with pneumonia, but "continues to go out of facility close to daily" and "has no mood or behavior problems." In early June 1998, J.B. had elective surgery to remove an occlusion in his left carotid artery. Notwithstanding these health problems, the staff notes J.B. "remains in good spirits" and continues to spend a lot of time at his home in Story City. The staff also states that although there have been "lots of family arguments historically," J.B. "seems to be in closer contact with his family this quarter."

The record also contains three social service assessments made in 1997, the last one only a month prior to the $13,000 loan. These assessments were intended "to identify psycho-social problems which are likely to cause difficulty for the resident, [his] family or staff within the next 90 days." Thus, these evaluations provide insight into J.B.'s emotional state during the relevant time frame.

The first assessment was made by facility staff on June 5, 1997. J.B.'s communications skills were evaluated in three areas: speech, vision and hearing. His speech was noted to be clear and the staff recorded that he was "very able to make [his] needs known." Noting that he wore eyeglasses, the staff concluded his vision was "adequate." Although he had some impairment of hearing, he did not wear a hearing aid. No problems were noted with his ambulation, appearance, hygiene, or nutritional status. The following notation was made with respect to his mental functioning: "alert, oriented—no apparent problems." Under the social functioning section, staff noted he "spends most of time out of facility" and similarly, had "minimal" activity involvement, as he was "usually out of facility." The evaluator

assessed his emotional state as "stable" and his behavior as "appropriate." It was noted that he had no psycho-social problems. Entries in this form document subsequent assessments on September 6, 1997, December 7, 1997, and March 1, 1998. These later evaluations indicate there had been no change in J.B.'s psychological or social functioning.

Another assessment form contains entries made on September 11, 1997, December 11, 1997, and March 12, 1998. It also documents J.B.'s physical, mental, and social condition. Notations include the following: (1) "[J.B.] spends most of his time away from our facility at his mobile home working on taxes and paperwork"; (2) "[J.B.] leaves the facility and keeps active on his own"; (3) "[J.B.] is very pleasant and doesn't normally attend activities here because he's busy"; (4) "Easy to get along with"; and (5) "[J.B.] is very friendly and has a great sense of humor.... [He] keeps very busy on his own and is gone most of the day on a daily basis." Although a section evaluating the resident's mental status indicates J.B. is "quiet," boxes for "anxious," "confusion," "depressed," "irritable," and "mood swings" are not checked.

A more detailed assessment form was completed in August 1998. This evaluation indicated J.B. had no memory problems, his daily decision-making ability was not impaired, and he had no indications of delirium or disordered thinking. The evaluator also assessed J.B.'s emotional state: no indicators of depression, anxiety or sad mood were observed. J.B. was rated "independent" in the areas of locomotion, dressing, eating, toilet use, and personal hygiene. The only functional area in which he was less than independent was a recorded need for "oversight help only" (as opposed to "physical help") in bathing. The August 1998 assessment also indicated

there had been no significant change in J.B.'s level of self-sufficiency in the last ninety days.

In addition to these records, a long-time friend of J.B., Carolyn Hasbrook, testified at the agency hearing. She said she had known J.B. for many years and visited him once every month or two, sometimes more, either at the Ames care facility or at his home in Story City. Hasbrook confirmed that J.B. was estranged from his son, but said that he had a good relationship with his stepdaughter. She testified she had not observed a "particular emotional vulnerability" in J.B. when his wife died, stating J.B. and his wife "were not soul mates. So her passing was ... it wasn't the emotional devastation that ... some couples would have when they lose their spouse. He pretty much went on with life as he had led it." This assessment was corroborated to some extent by investigator Noonan, who noted during his interview of J.B. that J.B. "never mentioned his wife's name when he spoke of her" and "did not appear saddened when he discussed her death." It is also worthy of note that attorney Huffer, who had known J.B. for thirty-seven years, never suggested that J.B. was in an emotionally vulnerable state due to his wife's passing or for any other reason.

■ When we view Dr. Specht's opinion that J.B. was emotionally vulnerable and unable to protect his interests in light of the entire record before the agency, we must conclude, as did the district court, that this opinion is not sufficient to support the agency's conclusion that J.B. was a dependent adult. The record does not support a finding that J.B. had any cognitive, mental, or emotional problems from January 1998 through July 1998. The mere fact that his wife died does not provide an adequate basis to conclude that J.B. was emotionally dependent in light of the consistent and contemporaneous docu-

mentation in the record that he was not sad, depressed, confused, anxious, or isolated. Dr. Specht's opinion to the contrary is based on sheer speculation and cannot be considered substantial evidence in support of DIA's determination that J.B. was a dependent adult.

In conclusion, we agree with the district court that the agency's finding that J.B. was a dependent adult in 1998 is not supported by substantial evidence. The quantity and quality of the evidence would not be deemed sufficient by a reasonable person to establish that J.B. was not able to manage his medications due to a physical or mental condition and was emotionally isolated and vulnerable. More to the point, a neutral, detached and reasonable person would not consider the evidence adequate to prove that J.B. could not protect his own interests or provide for his essential needs during the time in question.

### VII. *Summary and Disposition.*

DIA's determination that Mosher was a "caretaker" after she left her position at the Ames facility in August 1998 is based on an erroneous interpretation of chapter 235B. Section 235B.2(5)(*a*)(1)(*c*) requires that a person qualify as a caretaker at the time of each specific act of abuse. DIA incorrectly concluded that once Mosher was determined to be a caretaker during her term as administrator at the Ames facility, that status automatically continued regardless of whether she thereafter had responsibility for J.B.'s "protection, care, or custody." *See* Iowa Code § 235B.2(1) (defining "caretaker").

DIA's conclusion that Mosher was a caretaker after August 1998 is erroneous for the additional reason that it is based on a determination of fact that is not supported by substantial evidence in the record. Evidence that Mosher visited J.B. and voluntarily assisted him with errands and other matters is insufficient to establish that she assumed responsibility for J.B.'s protection, care, or custody after he left the Ames facility.

DIA made similar errors in its determination that J.B. was a "dependent adult." Initially this determination is based on an erroneous interpretation of the statutory definition of this term. A person does not qualify as a dependent adult simply because he or she is certified for admission to a chapter 135C nursing facility. We give no deference to DIA's contrary interpretation, as DIA has not been vested with discretion to interpret the dependent adult abuse statute, chapter 235B.

The agency's determination that J.B. was a dependent adult in 1998 is erroneous for the additional reason that it is based upon a determination of fact that is not supported by substantial evidence when the record before the agency is viewed as a whole. A neutral, detached, and reasonable person would not conclude based on the quantity and quality of the evidence in the record that J.B. suffered from a physical or mental condition that rendered him unable to protect his own interests or to provide for his essential needs during the time he resided at the Ames facility.

In view of our conclusion the evidence does not establish Mosher was J.B.'s caretaker subsequent to August 1998, the agency's determination that Mosher committed dependent adult abuse after that date must be reversed. Similarly, in view of our decision that the evidence does not show J.B. was a dependent adult during his time at the Ames nursing facility, DIA's determination that Mosher committed dependent adult abuse in 1998 must also be reversed. While our decision should not be taken as approval of Mosher's conduct, we are convinced the record does not establish she committed depen-

dent adult abuse within the purview of chapter 235B.

We affirm the district court's judgment reversing DIA's final decision and ordering the expungement of Mosher's name from the dependent adult abuse registry.

**AFFIRMED.**

All justices concur except WIGGINS, J., who takes no part.