# IN THE COURT OF APPEALS OF IOWA

No. 15-1465
Filed August 17, 2016

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DANI ROCHELLE ROGERS,**
        Defendant-Appellant.
_____


        Appeal from the Iowa District Court for Jasper County, Susan A. Cox, District Associate Judge.


        A defendant appeals her conviction for dependent adult abuse by financial exploitation. **AFFIRMED.**


        Dennis E. McKelvie of McKelvie Law Office, Grinnell, for appellant.

        Thomas J. Miller, Attorney General, and Kevin Cmelik and Genevieve Reinkoester, Assistant Attorneys General, for appellee.


        Considered by Danilson, C.J., and Vaitheswaran and Tabor, JJ.

**TABOR, Judge.**

A jury convicted Dani Rogers of dependent adult abuse for financially exploiting a man she called her "second dad." On appeal, she challenges the sufficiency of the State's proof and an evidentiary ruling by the district court. Finding no error in either instance, we affirm her conviction.

## I. Facts and Prior Proceedings

Charles Gill called 911 from his bedroom on November 20, 2013. Paramedics arrived to find the sixty-seven-year-old man in poor physical condition—"very malnourished" and "very weak." Gill was alert and oriented to time and place but in the view of the paramedics, not physically capable of caring for himself. Gill told the paramedics he had wanted to go to the hospital a few days earlier. The paramedics noticed Gill had not showered or bathed in a while and was in need of a fresh set of clothes. The house was "filthy" and so cluttered the paramedics could not move their stretcher into the bedroom. Gill could not walk on his own, so the paramedics had to lift him from the bed before they transported him to Skiff Medical Center in Newton.[1]

At the hospital, respiratory therapist Scott Pline found Gill "unkempt" and short of breath. Gill suffered from chronic obstructive pulmonary disease (COPD); the trial record revealed that, as a soldier in Vietnam, Gill was exposed to Agent Orange and also that he was a heavy smoker. Coincidentally, Pline

---

[1] The paramedics' trip to Gill's home came about three months after the Newton police department performed a welfare check following an anonymous tip identifying Rogers or Amanda Sexton as Gill's caretakers. In August 2013, Detective Chris Wing went to the house and faced resistance from Sexton when he asked to see Gill. The detective recalled Gill was extremely thin, used a walker and oxygen, and needed help opening doors. Gill said Sexton was his caretaker.

was Gill's next-door neighbor and agreed to take over as his general power of attorney while an investigation into Gill's finances unfolded.

That investigation, launched by the Iowa Department of Human Services (DHS), centered on Dani Rogers, who had been granted Gill's power of attorney since May 2012. As part of the DHS investigation, police officer Rob Burdess met with Gill five days after he was admitted to the hospital; Gill was "very frail" and "not very verbal" due to his weakened state.

Officer Burdess also interviewed Rogers on December 3, 2013, advising her that he was conducting a criminal investigation. Rogers said Gill "was like a father to her" and she agreed to help him with his finances after the November 2011 death of his adult daughter Kathie, who was a close friend of Rogers. Kathie had taken over the care of her father after his wife died several years earlier. Rogers described Gill as "grief stricken" over losing Kathie and as "a difficult man to get along with." Rogers, who was unemployed, claimed she reached an agreement with Gill that if she moved in and cared for him, she would be paid $400 to $500 a month and would be given the house in his will.

Rogers said she and her two children started staying with Gill in December 2011 but about six weeks later moved in with her boyfriend. Over the next eighteen months, Rogers allowed a string of acquaintances to live in Gill's home rent-free, including Amanda Sexton, who was supposed to cook meals for Gill when she moved in with him in May 2013.

Rogers also told the officer she wrote checks on Gill's account and Gill would sign them. Gill was on a fixed income, and Rogers said she "typically" did not receive the monthly compensation under their agreement but rather took

money for gas and other incidentals when she needed it. She mentioned three particular transactions where she received money from Gill, but insisted those were reimbursed. First, she accepted a check for $480 to pay off her Christmas layaway. Second, she received forty dollars to pay for her daughter's dance lessons. Third, two checks totaling $384.80 were written to Newton Water Works to pay the past due water bill for the residence where she lived with her boyfriend. Rogers acknowledged she "got behind" on paying Gill's water bill and his mortgage installments. When Officer Burdess informed Rogers she had been replaced as Gill's attorney-in-fact, she expressed relief: "I love Charles, he's like my second dad, but I put my life on hold for him. . . . I'm getting my life back."

Pline testified when he took over as Gill's power of attorney, the bank accounts were "a mess." The mortgage had been turned over to the foreclosure department and Gill's water and electrical bills were hundreds of dollars in arrears. Gill's banking records showed that between December 13, 2012, and November 18, 2013, forty-one checks, totaling $6805, had been written to Rogers. Another fourteen checks, dated between May 30, 2013, and December 2, 2013, had been written to Amanda Sexton.

Gill never returned to his Newton home. He went from the hospital to the Iowa Veterans Home in Marshalltown where he died about a month later on Christmas Day 2013.

The State charged Rogers with dependent adult abuse, a class "D" felony in violation of Iowa Code sections 235B.2(5) and 235B.20(5) (2011), by trial information filed on June 13, 2014. An amended trial information alleged Rogers exploited

a dependent adult, Charles Gill, by taking unfair advantage of a dependent adult's financial resources for [her] own personal or pecuniary profit, without the informed consent to the dependent adult, including theft by deception, false representation, or false pretenses, and the value of the exploited property, assets, or resources exceeded $100 while acting as that person's caretaker.

The prosecution proceeded to a jury trial on May 11–13, 2015. The State called eight witnesses, and the defense called three witnesses, including Rogers. After deliberating for less than one hour, the jury returned a guilty verdict. Rogers filed a motion for new trial, alleging the court abused its discretion in excluding impeachment evidence concerning State's witness Amanda Sexton. The district court denied the new trial motion and imposed an indeterminate five-year sentence, suspended it, and placed Rogers on probation for two years. Rogers now appeals from her conviction.

## II.    Scope and Standards of Review

We review challenges to the sufficiency of the evidence for correction of legal error. *State v. Robinson*, 859 N.W.2d 464, 467 (Iowa 2015). In assessing the jury's finding of guilt, we view the evidence in a light most favorable to the State. *Id.* We are bound by the verdict unless it is not supported by substantial evidence. *Id.* We will consider the evidence to be substantial if it would convince rational jurors that Rogers was guilty beyond a reasonable doubt. *See id.*

We review the district court's decision to exclude impeachment evidence for an abuse of discretion. *See State v. Brodene*, 493 N.W.2d 793, 796 (Iowa 1992). The abuse-of-discretion standard means we afford "a great deal of leeway" to the district court's judgment call. *State v. Richards*, 879 N.W.2d 140, 145 (Iowa 2016) (quoting *State v. Newell*, 710 N.W.2d 6, 20–21 (Iowa 2006)).

**III.    Analysis**

**A.    Did the district court properly deny Rogers's motion for judgment of acquittal?**

Rogers contends the district court erred in denying her motion for judgment of acquittal.  She alleges three deficiencies in the State's evidence: (1) Gill was not a dependent adult; (2) she was not his caretaker; and (3) any actions she took regarding Gill's finances were done with his informed consent.

In considering Rogers's contention, we look to the marshalling instruction given to the jury.  The court instructed the jurors the State was required to prove the following elements:

> 1. On or about a time period from December 1, 2012 through December 2, 2013 Charles Gill was a dependent adult;
> 2. The Defendant was a caretaker of Charles Gill;
> 3. The Defendant willfully or negligently exploited Charles Gill by the act or process of taking unfair advantage of his physical or financial resources for her own personal or pecuniary profit, by the use of theft, undue influence, harassment, duress, deception, false representation, or false pretenses;
> 4. The Defendant did so without the informed consent of Charles Gill.

We will examine each of the disputed elements in turn.

**1.    Did the State present substantial evidence Gill was a dependent adult?**

The district court gave the jurors the following definition of a dependent adult: "a person eighteen years of age or older who is unable to protect the person's own interests or unable to adequately perform or obtain services necessary to meet essential human needs, as a result of a physical or mental condition which requires assistance from another."  *See* Iowa Code § 235B.2(4).

On appeal, Rogers argues Gill did not fit that definition because he lived in his own home, not a care facility; was not mentally infirm; and was able to meet his own needs or obtain services necessary to meet his needs. Rogers acknowledges Gill suffered from COPD but asserts his lung condition did not prevent him from making agreements with others to assist him in meeting his essential needs. She argues even if Gill eventually became a dependent adult, he was not so infirm at the time she borrowed money from him.

Rogers compares this case to *Mosher v. Department of Inspections & Appeals*, 671 N.W.2d 501, 515 (Iowa 2003), where the court found a lack of substantial evidence that a nursing home resident was a "dependent adult" under the statutory definition. *Mosher* held: "Our review of the record does not reveal evidentiary support for the witness's conclusion that J.B. required the assistance of the facility staff in managing his medications *due to 'a physical or mental condition,'* a necessary element of dependency under the statutory definition of 'dependent adult.'" 671 N.W.2d at 515.

We are not persuaded by Rogers's reliance on *Mosher*. That case highlights the State's obligation to show a nexus between the adult's physical or mental condition and the assistance provided by the caretaker to prove dependency. *Id. Mosher* does not relieve a caretaker of responsibility for dependent adult abuse when the adult was able to "obtain services" from a caretaker to meet his or her essential needs, but that caretaker failed to provide the critical services. Injecting such circularity into the definition of a dependent adult would undermine the protection of the statute.

Viewing the evidence in the light most favorable to the State, we conclude the prosecutor proved beyond a reasonable doubt Gill was a dependent adult. The State presented substantial evidence Gill's physical and mental condition rendered him unable to care for himself and he was unable to "adequately . . . obtain the services necessary to meet [his] essential human needs." Gill suffered from a debilitating lung condition and rarely left his home. His vision was impaired, so he needed help paying his bills. Rogers told the police that Gill suffered from depression and post-traumatic stress disorder from his military service. As the State points out on appeal, under Rogers's care, Gill's home went into foreclosure, his electricity and gas were shut off, his water bill was delinquent, his personal hygiene needs were unmet, and eventually he grew so weak he could not stand up. Gill's attempt to obtain services from Rogers and Sexton was not adequate to meet his essential needs.

The district court offered an insightful summary of the State's evidence:

> [Gill] was homebound if not room bound. The [evidence shows the] extent of his travels went from the bathroom to his bed and back, that he relied on other individuals and needed other individuals to protect his interests and to perform services necessary to meet his essential needs, such as getting food for him, assisting him in paying his bills, so that he could have the necessary living conditions based upon his frail conditions, and that his fragility was based upon his physical and mental condition. The court would note that the record established he died shortly—within one month—of being transported to the hospital in this case.

As the district court determined, substantial evidence supported Gill's status as a dependent adult.

**2.    Did the State present substantial evidence Rogers acted as Gill's caretaker?**

The district court gave the jurors the following definition of a caretaker: "a related or nonrelated person who has the responsibility for the protection, care, or custody of a dependent adult as a result of assuming the responsibility voluntarily."  *See* Iowa Code § 235B.2(1).

On appeal Rogers argues she did not fit that definition because she did nothing more than run errands for Gill at his request.  She contends choosing to "help her friend's dad with his daily chores such as grocery shopping and paying bills" was not the equivalent of taking responsibility for his "protection, care or custody."  She again cites *Mosher*, where the court decided "periodic visits" and running occasional errands did not constitute the voluntary caretaking of a dependent adult.  671 N.W.2d at 511.

The caretaking duties voluntarily assumed by Rogers far exceeded the casual relationship in *Mosher*.  According to Rogers's own version, she agreed to fill the caretaking role left vacant by the death of Gill's daughter.  She initially moved in with Gill and assisted him with cooking, cleaning, lawn care, and repairs.  She became his power of attorney and assumed responsibility for his bank accounts and paying household bills.  According to Rogers's own testimony, Gill did not have a debit card, so she wrote checks to herself and retrieved cash to make purchases for Gill.  She purchased food for him on an almost daily basis.

The State presented substantial evidence to support Rogers's status as Gill's voluntary caretaker.

**3.** **Did the State prove Rogers willfully or negligently exploited Gill by taking unfair advantage of his physical or financial resources for her personal profit without his informed consent?**

A person commits dependent adult abuse by "taking unfair advantage of a dependent adult or the adult's physical or financial resources for one's own personal or pecuniary profit" without the dependent adult's informed consent. Iowa Code § 235B.2(5)(1)(c). "Theft is one way of committing dependent adult abuse. The statute also lists 'the use of undue influence, harassment, duress, deception, false representation, or false pretenses' as other means by which dependent adult abuse may occur." *State v. Nelson*, No. 14-0888, 2015 WL 5965022, at *2 (Iowa Ct. App. Oct. 14, 2015) (quoting Iowa Code § 235B.2(5)(1)(c) (2013)).

Rogers argues the State did not offer substantial evidence to prove she "used improper means to influence Charles Gill to loan her money." She contends the power of attorney authorized her to write checks on Gill's account, "so any time she did so was within her purview as power of attorney." She claims the State failed to prove she took any actions regarding Gill's finances without his informed consent.

The State counters the evidence was sufficient for the jury to find Rogers took unfair advantage of Gill's financial resources for her personal profit. The State makes a compelling case for exploitation:

> The evidence at trial showed that when [Rogers] voluntarily assumed Mr. Gill's care and obtained a power of attorney in December 2012, Mr. Gill's utility bills and house payment were current, and his accounts in good standing. . . . In the year that [she] cared for Mr. Gill, his electric, gas, and water bills became so delinquent the various utility companies either stopped service to his home or attempted to stop service. . . . His mortgage also

became delinquent, and his house was put into foreclosure. . . . Mr. Gill lost weight and was weak from malnourishment.

The State juxtaposes the neglect of Gill's essential needs with benefits derived by Rogers:

> In this same time period, checks from Mr. Gill's bank account were used to pay [Rogers's] utility bills and to pay for [her] Christmas presents, as well as other personal bills. . . . The police investigation determined that during this time period, checks totaling $6805 were written to [Rogers]. . . . While [she] claims she cashed these checks and used the money to buy necessary items for Mr. Gill, the cash was untraceable, and there was overwhelming evidence at trial that Defendant wholly neglected to pay for the basic services Mr. Gill needed.

In denying the motion for judgment of acquittal, the district court found the State offered substantial evidence Rogers financially exploited Gill without his informed consent. The district court also decided the evidence showed Rogers exploited Gill's physical resources:

> His home was exploited. He was a private individual and others were allowed to stay in his home. Despite his depression and not wanting to leave the house, these individuals came to his home through the defendant, and she had contacts and connections with them, so not only was his financial situation exploited, but also his physical, his home environment was exploited.

Substantial evidence supports the court's finding Rogers used improper means to influence Gill to lend her money or to otherwise profit from handling his finances. Contrary to her argument, the power of attorney did not give her authority to fail to pay Gill's bills and instead use his money to pay her own obligations. Her services as his attorney-in-fact were to be done without compensation (though she described a different financial arrangement in her interview with police), and she was liable for willful misconduct or breach of good

faith in her performance of those duties. On this record, we decline to disturb the jury's verdict.

**B.** **Did the district court abuse its discretion in rejecting the defense request to impeach a State's witness with prior convictions?**

Rogers contends she is entitled to a new trial because the district court did not allow her to ask State's witness Amanda Sexton about her prior convictions. The prosecutor provided belated notice that he intended to call Sexton as a witness—filing a notice of additional witness on Thursday, May 7 when trial was scheduled to start Monday, May 11. The court granted the State's motion on May 8.

Sexton testified on May 12, the second day of trial. In her direct testimony, she explained she was a friend of Rogers and of Gill's daughter Kathie. Sexton said Rogers let her stay at Gill's home, where Rogers also lived "on and off." She testified Gill's vision was bad and "he needed things to be written out for him." She also said he needed help with shopping because "he did not leave the house." Sexton said Rogers would take care of Gill's daily list of errands and handled his money. She also testified a civil process server came to Gill's house to serve foreclosure papers and Rogers signed for them but did not tell Gill because "he would have been really mad." She acknowledged receiving about a dozen checks written on Gill's account made out to her. Sexton said she turned over some of the money to Rogers so she could buy things for Gill and the change went to Rogers. Sexton also identified checks written to her after the date Gill went into the hospital.

Before Sexton's cross examination, defense counsel asked if the State had information about her prior convictions and sought the court's permission to use any convictions to impeach the witness.

Impeachment of a witness's credibility by evidence of conviction of a crime is governed by Iowa Rule of Evidence 5.609, which states in relevant part:

> a. *General rule.* For the purpose of attacking the credibility of a witness:
> (1) Evidence that a witness other than the accused has been convicted of a crime shall be admitted, subject to rule 5.403, if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and
> (2) Evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.
> b. *Time limit.* Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than ten years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

Sexton had three prior convictions: fifth-degree theft in February 2002, forgery in July 2002, and driving while barred in October 2007. The district court excluded all three convictions, concluding Rogers, as the proponent of the evidence, did not comply with the advance written notice requirement in rule 5.609(b). The court further noted the forgery and theft convictions were "thirteen years past" and ruled their probative value was not substantially outweighed by

their prejudicial effect. The court then found the driving-while-barred offense had "absolutely no probative value regarding the credibility of the witness."

On appeal, Rogers claims it was in the interest of justice to allow her to impeach Sexton "by introducing the conviction because evidence of prior convictions of fraud and theft are certainly probative in a fraud case." She also argues the court denied her a fair trial by allowing the State to add Sexton as a last-minute witness but excluding her convictions based on the defense failure to give prior notice.

Regardless of the notice issue, we hold the district court acted within its discretion in declining to allow Rogers to impeach Sexton with her convictions dating back thirteen years. Rule 5.609(b) "in effect, creates a rebuttable presumption that convictions over ten years old are more prejudicial than probative and are therefore inadmissible." *State v. Roby*, 495 N.W.2d 773, 775 (Iowa Ct. App. 1992). As proponent of the evidence, Rogers pointed to no specific facts to show the probative value of Sexton's theft and forgery convictions would substantially outweigh their prejudicial impact to rebut the presumption of inadmissibility. Accordingly, we defer to the district court's judgment call not to allow the antiquated impeachment evidence.

Finally, even assuming the district court abused its discretion in not allowing Rogers to impeach Sexton with her prior convictions, any error was harmless. We will not predicate error upon a ruling which excludes evidence unless a substantial right of the defendant is affected. *See* Iowa R. Evid. 5.103(a); *State v. Parker*, 747 N.W.2d 196, 209 (Iowa 2008). After reviewing the direct and cross examinations of Sexton, we do not figure an introduction of her

thirteen-year-old convictions would have substantially affected Rogers's right to a fair trial. Sexton's credibility was not a pivotal issue. Most of her recollections of the interactions between Gill and Rogers were consistent with those offered by Rogers in her own testimony. The exclusion of Sexton's convictions did not influence the jury's decision to convict Rogers.

**AFFIRMED.**