# IN THE SUPREME COURT OF IOWA

No. 51 / 05-1255

Filed September 28, 2007

**IOWA ASSOCIATION OF SCHOOL BOARDS,**

Appellant,

vs.

**IOWA DEPARTMENT OF EDUCATION** and
**THE IOWA AUDITOR OF STATE,**

Appellees.

_____

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

Nonprofit corporation representing interests of school districts appeals district court decision on judicial review affirming agency declaratory orders refusing school districts' request to use special property tax levy to pay portion of districts' fuel costs. **AFFIRMED.**

Dennis W. Johnson and Cristina F. Kuhn of Dorsey & Whitney LLP, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Christie J. Scase, Assistant Attorney General, for appellees.

**TERNUS, Chief Justice.**

School districts in Iowa want to use a special property tax levy to pay for a portion of their transportation fuel costs. The appellant, Iowa Association of School Boards, sought separate declaratory rulings from the appellees, Iowa Department of Education and the Iowa Auditor of State, that would authorize member school districts to expend property taxes levied under Iowa Code section 298.4 (2003) on fuel purchased under a "fleet services program" administered through the association. Both agencies ruled school districts could not use monies raised by the special property tax levy permitted by section 298.4 for this purpose. The agencies' declaratory orders were affirmed by the district court on judicial review. After considering the arguments of the parties and the relevant legal authorities, we agree with the district court and affirm its decision.

## I. Background Facts and Proceedings.

The facts in this case are undisputed. Every school district in Iowa is required to provide transportation to students living more than a specified distance from the student's designated school. Iowa Code § 285.1(1). The annual cost of fuel to provide this transportation is a major expense for school districts. While the expense of fuel poses a challenge in itself, budgeting for this expense in a time of fluctuating fuel prices is even more challenging.

School districts operate on a fiscal year of July 1 through June 30. *See id.* § 24.3. Local property taxes and state aid are the two primary funding sources for the districts. *See generally id.* ch. 257. In order to allow sufficient time to set property tax rates for the following year, districts must certify a budget for the upcoming fiscal year by April 15. *See id.* §§ 24.17, .20. After a budget is certified and the time for

amendment has expired, the district's authorized expenditures may not exceed the budgeted amount, as supplemented by any unspent balance from the preceding year. *Id.* § 257.7. In addition, the authorized tax rates and levies computed on the basis of the certified budget are final for the ensuing fiscal year. *Id.* § 24.20.

Because budgets are finalized so far in advance, school districts face a constant uncertainty over the impact an increase in fuel prices will have on their operating budgets. The Iowa Association of School Boards, a nonprofit organization representing the interests of its public-school-district members, devised a way to assist school districts in reducing and managing unpredictable and rising fuel costs. Through a program administered by the association, Iowa Joint Utilities Management Program, Inc. (IJUMP), participating members are offered the opportunity to purchase fuel at a set price throughout the fiscal year. Under IJUMP's "fleet services program,"[1] each participating district enters into a twelve-month, renewable participant agreement that designates IJUMP as the district's contracting agent for the purchase and delivery of vehicle fuel. The district is then permitted to purchase fuel throughout the fiscal year at a guaranteed price that is established on January 31 of the preceding fiscal year.

In addition to promising to pay for gasoline purchased pursuant to the agreement, the district agrees to pay an annual "risk management fee" determined on the basis of the price per gallon and the total number of gallons that the district "elects to insure" during the term of the

---

[1]The "participant agreement" between the individual school districts and IJUMP refers to the fuel-purchase arrangement as "Fleet Services," "the Fleet Services Program" or "IJUMP-Fleet Services." In contrast to the contractual language, the association refers to the fleet services program in its pleadings and briefs as a "fuel risk management program." We, like the agencies whose decisions are challenged in this appeal, choose to use the contractual language.

contract. IJUMP uses the management fee collected from the participating district to pay any difference between the guaranteed fuel price and the actual price of fuel delivered to the district. At the end of the fiscal year, any surplus in the district's account, i.e., any remaining management fee paid by the district, may be rolled over to the next fiscal year. Alternatively, the district may choose to receive a payment based on the number of gallons of fuel purchased during the year, minus program administration costs. If the management fee is insufficient to cover the difference between the guaranteed price and the actual cost of the fuel used by the district, IJUMP will bill the district for the shortfall or will charge a higher fee in the following year to cover the deficit.

The present dispute arises from participating districts' desire to pay the management fee required by the fleet services program through a special "district management levy" authorized by Iowa Code section 298.4. Section 298.4 allows a district to levy a property tax in addition to the property taxes for the general school fund permitted by chapter 257. The tax collected through the district management levy must be placed in the district's management levy fund and can be expended only for purposes specified in section 298.4.

In January 2005, the association, on behalf of its members, filed petitions for declaratory order with the Iowa Department of Education and the Iowa Auditor of State seeking declaratory rulings that the school districts had the authority to use district management levy funds to pay the management fee required for participation in IJUMP's fleet services program. The association contended this expenditure was authorized by section 298.4(3), which allows payments from the district management levy fund "[t]o pay the costs of insurance agreements under section 296.7."

In identical declaratory orders, the department and auditor ruled that the fleet services program was not "insurance" as that term is used in section 296.7. The agencies stated that "[t]he essence of an insurance agreement is that one party pays consideration to a second party in return for the second party assuming some specified risk for the first party." They noted that, under the fleet services program, "no risk is assumed by IJUMP. The risk remains with the participating districts at all times." The agencies concluded the fleet services program was "akin to a budget-billing plan where the <u>certainty</u> of the price of fuel is set for a twelve-month period, but increases are still eventually absorbed solely by the district." Based on this analysis, the agencies ruled the management fee for the fleet services program did not represent the cost of an insurance agreement, and accordingly, "a district may not fund any part of its participation from the district's management levy funds."

The association filed a petition for judicial review, asking the court to reverse the agencies' decisions. Initially, the district court determined the Department of Education had authority to interpret chapters 296 and 298. Therefore, granting appropriate deference to the department's interpretation of the pertinent statutes, the district court reviewed the department's decision under section 17A.19(10)(*l*). This statute states, in part, that the court "shall reverse, modify, or grant other appropriate relief from agency action" if the agency action is "[b]ased upon an irrational, illogical, or wholly unjustifiable interpretation of a provision of law." Iowa Code § 17A.19(10)(*l*). After analyzing the language of section 296.7(1), the court agreed with the agencies that the participant agreement for the fleet services program was not an "insurance agreement" as contemplated by that statute. Therefore, the court held,

"the agencies logically, rationally and justifiably applied [the governing statutes] to the facts of this case."

The association has appealed the district court's decision, raising two issues. First, the association contends the department's interpretation of section 298.4(3) and section 296.7(1) is not entitled to deference. Secondly, the association argues school districts have authority to use district management levy funds to pay the management fee required for participation in the IJUMP fleet services program. We address each issue separately.

## II.  Standard of Review.

**A.  General Principles.**  We review district court decisions on judicial review of agency action under the standards of Iowa Code chapter 17A, the Administrative Procedure Act.  *Mosher v. Dep't of Inspections & Appeals*, 671 N.W.2d 501, 508 (Iowa 2003).  Section 17A.19(10) governs review of the agency action itself.  Applying the standards of section 17A.19(10), we determine whether our conclusions are the same as those of the district court.  *Id.*

In this case, the association's challenge is based on the agencies' alleged erroneous interpretation of the controlling statutes. Consequently, one of two possible standards for review applies.  Under section 17A.19(10), a court must reverse agency action when "substantial rights of the person seeking judicial review have been prejudiced because the agency action is any of the following":

> *c.* Based upon an erroneous interpretation of a provision of law whose interpretation has not clearly been vested by a provision of law in the discretion of the agency.
>
> . . . .
>
> *l.* Based upon an irrational, illogical, or wholly unjustifiable interpretation of a provision of law whose

interpretation has clearly been vested by a provision of law in the discretion of the agency.

Iowa Code § 17A.19(10)(*c*), (*l*). As a comparison of these provisions reveals, the appropriate standard of review depends on whether the legislature has clearly vested the interpretation of the statute at issue in the discretion of the agency.

When an agency has not clearly been vested with the discretion to interpret the pertinent statute, the court gives no deference to the agency's interpretation of the statute. *Id.* § 17A.19(11)(*b*). Under these circumstances, the court on judicial review simply determines whether the agency's interpretation was "erroneous." *Id.* § 17A.19(10)(*c*); *see also Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004). When the agency has been granted discretion to interpret the statute at issue, the court must "give appropriate deference" to the agency's interpretation. Iowa Code § 17A.19(11)(*c*). In this situation, the agency's interpretation of the statute will be followed unless it is "irrational, illogical, or wholly unjustifiable." *Id.* § 17A.19(10)(*l*); *see also ABC Disposal Sys., Inc. v. Dep't of Natural Res.*, 681 N.W.2d 596, 602 (Iowa 2004).

In deciding whether the interpretation of a statute has clearly been vested by a provision of law in the agency's discretion, we give no deference to the agency's view of this matter. Iowa Code § 17A.19(11)(*a*). To inform our decision, we consider " 'the precise language of the statute, its context, the purpose of the statute, and the practical considerations involved.' " *Mosher*, 671 N.W.2d at 509 (quoting Arthur E. Bonfield, *Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 63

(1998) [hereinafter Bonfield]). Based on this review and using our " 'own independent judgment,' " we decide whether

> "[w]e have a firm conviction . . . that the legislature actually intended (or would have intended had it thought about the question) to delegate to the agency interpretive power with the binding force of law over the elaboration of the provision in question."

*Id.* (quoting Bonfield at 63).

**B. Discussion.**[2] Iowa Code section 256.1 establishes the Department of Education "to act in a policymaking and advisory capacity and to exercise general supervision over the state system of education including . . . [p]ublic elementary and secondary schools." The director of the department has numerous specified duties. *See* Iowa Code § 256.9. Section 256.9(16) provides that the director "shall . . . [i]nterpret the school laws and rules relating to the school laws." *Id.* § 256.9(16). It is undeniable that this statute clearly vests the director with discretion to interpret "school laws." Although the association acknowledges the director's duty and authority to interpret school laws, it argues sections 298.4 and 296.7 are not school laws. According to the association, these provisions are taxing statutes. We disagree.

Section 298.4 authorizes school districts to levy a tax on all taxable property in the district, requires that the proceeds of the levy be deposited in a district management levy fund, and specifies five purposes for which this fund can be expended. Section 296.7 authorizes school districts to enter into specified insurance agreements and to levy taxes

---

[2]As noted above, the auditor's declaratory order was identical to the department's declaratory order. Therefore, if either agency has clearly been granted discretion to interpret the pertinent statutes, we must give deference to the agency interpretation and review the agency order under the "irrational, illogical, or wholly unjustifiable" standard. Because we determine the department was given such discretion, we need not consider whether the auditor had any discretion with respect to this matter.

under section 298.4 to pay for such agreements. While sections 298.4 and 296.7 certainly deal with taxation, we think their primary purpose is to delineate and control school spending. The principal focus of these statutes is not on the assessment and collection of the tax, but on the expenditure of the tax revenues. Moreover, both provisions are located in Title VII, "Education and Cultural Affairs" subtitle 6, "School Districts," rather than in Title X, "Financial Resources," which encompasses various taxing laws. Chapter 256, in which the director is charged with the interpretation of "school laws," is also in Title VII governing education. Thus, the context of sections 298.4 and 296.7 supports the district court's conclusion the department, acting through its director, has been vested with discretion to interpret these provisions.

In addition to the purpose and context of these laws, the practical considerations involved also support our conclusion. Because school financing is so complex, there are practical reasons the legislature would want all laws affecting school finances subject to the interpretive authority of the agency charged with oversight of those finances—the Department of Education. In an analogous situation, we held the Iowa Utilities Board had clearly been vested with discretion to interpret laws governing telecommunications companies based on the board's "broad authority . . . to regulate the rates and services of public utilities." *AT&T Commc'ns of the Midwest, Inc. v. Iowa Utils. Bd.*, 687 N.W.2d 554, 561 (Iowa 2004). Similarly, in the present case, the department has broad authority over school budgeting and financing. *See generally* Iowa Code §§ 257.30 (establishing a school budget review committee in the department, chaired by the director), .31 (describing extensive duties of school budget review committee, including review of each district's proposed and certified budgets). Consequently, it would be odd, indeed,

to exclude from the director's duty to interpret school laws the provisions governing school districts' establishment and use of the district management levy fund simply because the source of this fund is tax revenues.

For the foregoing reasons, we are convinced the legislature intended to vest the department's director with the discretion to interpret sections 298.4 and 296.7. Accordingly, we give appropriate deference to the agency's interpretation of these statutes by reviewing its interpretation under the standard set forth in section 17A.19(10)(*l*). Under that standard, we will not reverse the agency's interpretation unless it is "irrational, illogical, or wholly unjustifiable." Iowa Code § 17A.19(10)(*l*).

**III. Use of District Management Levy Fund For Fleet Services Program Management Fees.**

**A. Relevant Statutes.** As previously noted, a school district that establishes a district management levy fund under section 298.4 may use monies from this fund only for specified purposes. One such purpose is "the costs of insurance agreements under section 296.7." *Id.* § 298.4(3). Section 296.7 provides in pertinent part:

> 1. A school district . . . may . . . enter into insurance agreements obligating the school district . . . to make payments beyond its current budget year for one or more of the following mechanisms to protect the school district . . . from tort liability, loss of property, environmental hazards, or any other risk associated with the operation of the school district or corporation:
> *a.* To procure or provide for a policy of insurance.
> *b.* To provide a self-insurance program.
> *c.* To establish and maintain a local government risk pool.

*Id.* § 296.7(1).

**B. Parties' Contentions.** The department interpreted the term "insurance agreements" in a traditional sense, holding an agreement must at least transfer the risk of loss from one party to another to fall within the statute. The association criticizes this interpretation, arguing section 296.7 allows a school district to use the district management levy fund for any mechanism that protects the district from any risk associated with the operation of the school district. It argues the legislature's authorization of self-insurance programs and local government risk pools indicates section 296.7 "is not limited to only traditional insurance agreements or insurance policies."

The department rejects the association's broad interpretation of the statute for several reasons. First, it asserts, the plain language of section 296.7 limits the included "mechanisms" to "insurance agreements" in the form of "a policy of insurance," "a self-insurance program," or "a local government risk pool," none of which encompasses the fleet services program agreement. Second, it contends if the fund could be used for *any* expenditure that protects the district against *any* risk, there would be no limit to what expenses could be transferred out of the general budget and into the district management levy fund:

> The purchase of a sprinkler system or rental of an off-site computer data back-up site reduces the risk of disruption to the delivery of educational programs which could result from fire or a computer system crash. Similarly, inoculation of teachers with flu shots or hepatitis vaccine offers protection against teacher illness and protects against the potential cost and disruption to the operation of a school caused by teacher absences and the hiring of substitutes.

Finally, the department points out the limitations on taxing and spending authority contained in the basic school finance formula, *see id.* §§ 257.1–.4, would be readily circumvented under the association's interpretation, thereby thwarting the legislative goal in controlling school

spending: "to equalize the amount of funds available to finance the education of every child in the state regardless of where the child lives." *Exira Cmty. Sch. Dist. v. State*, 512 N.W.2d 787, 793 (Iowa 1994).

**C. Discussion.** We focus our discussion on the core requirement of section 296.7 that, regardless of what "mechanism" a district chooses to employ (a policy of insurance, a self-insurance program, or a local government risk pool), that mechanism must be "an insurance agreement" that "protect[s] the school district . . . from tort liability, loss of property, environmental hazards, or any other risk associated with the operation of the school district." Iowa Code § 296.7(1). The department suggests this language restricts covered mechanisms to those that accomplish the traditional purpose of insurance: protection against the risk of loss. The association interprets the phrase "any risk associated with its operation" literally and broadly to mean *any* risk, not necessarily a risk of loss. Based on our study of the statute and relevant authorities, we are convinced the department's interpretation of section 296.7(1) is not irrational, illogical, or wholly unjustifiable.

The goal of statutory interpretation is to ascertain legislative intent, and that intent is determined by "the words chosen by the legislature." *Auen*, 679 N.W.2d at 590. Consequently, to determine whether the contract between IJUMP and the districts is an "insurance agreement" that protects the school district from a "risk associated with the operation of the school district," we must identify what the legislature meant by "insurance" and "risk." Because these terms are not defined in the statute, "we look to prior decisions of this court and others, similar statutes, dictionary definitions, and common usage." *Gardin v. Long Beach Mortgage Co.*, 661 N.W.2d 193, 197 (Iowa 2003). In addition, "we consider the context of the provision[s] at issue and interpret the

provision[s] consistent with the entire statute of which [they are] a part."
*State v. Kamber*, 737 N.W.2d 297, 299 (Iowa 2007).

We begin with the common meaning of the word "risk." Black's Law Dictionary defines "risk" as "[t]he chance of injury, damage, or loss; danger or hazard . . . ." *Black's Law Dictionary* 1328 (7th ed. 1999). The general dictionary definition is similar: "possibility of loss or injury." *Merriam-Webster's Collegiate Dictionary* 1008 (10th ed. 2002). Significantly, the common meaning of this term is consistent with its usage in the context of insurance. A leading treatise on insurance law suggests that the primary attribute of insurance is "the assumption of a *risk of loss* and the undertaking to indemnify the insured against such *loss*." 1 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 1:9, at 1–16 (1995) (emphasis added); *accord* 1 Eric M. Holmes & Mark S. Rhodes, *Holmes's Appleman on Insurance 2d* § 1.3, at 16 (1996) (noting common-law definition of insurance describes insurer's obligation to pay " 'upon the *destruction, loss or injury* of something in which the [insured] has an interest' " (emphasis added) (quoting Mass. Gen. Laws ch. 175, § 2 (1935)) [hereinafter "*Appleman on Insurance 2d*"]; 43 Am. Jur. 2d *Insurance* § 2, at 49 (2003) ("Insurance, therefore, is a means of distributing the *risks of loss*." (Emphasis added.)). Another notable treatise in this field states: "In the insurance contract, *the risk of an actual loss* is distributed (socialized) among a large group of persons exposed to a comparable *risk of loss*." 1 *Appleman on Insurance 2d* § 1.3, at 11 (emphasis added). "Loss" means "destruction," "a person or thing or an amount that is lost," or "the amount of an insured's financial detriment by death or damage that the insurer becomes liable for." *Merriam-Webster's Collegiate Dictionary* 687. Finally, we note the other contingencies against which the school district may protect itself by

using an insurance agreement—tort liability, loss of property, and environmental hazards—all contain an element of injury, loss, or damage. Based on these considerations, we think it is rational, logical, and wholly justifiable to interpret section 296.7(1) as permitting only insurance agreements that pay for mechanisms protecting the school district against a risk of *loss*.

The participant agreement for the fleet services program does not protect the district against a risk of loss. As the department concluded, the fleet services program is a budget-billing plan that allows the district to defer payment of fuel costs in excess of the guaranteed price to the next fiscal year. Under the program, there is no loss incurred by the district, and the district remains liable for the full cost of its fuel purchases. The fleet services program does not provide loss protection.

The association argues the possibility of high fuel costs is not the only risk "insured" by the fleet services program:

> School districts fund their fuel expenditures from their general fund. Therefore, unanticipated increases in fuel expenditures during the fiscal year may at times force school districts to reduce educational programs or services for the students. IJUMP is intended to protect school districts from this risk of disruption in the delivery of educational programs and services.

Although *avoidance* of a disruption in the delivery of educational programs and services may be the *goal* of districts participating in IJUMP's fleet services program, there is no provision in the contract between IJUMP and the districts that even remotely addresses the coverage of losses caused by a realization of the risk of such a disruption. The department's refusal to interpret section 296.7(1) as authorizing expenditures from the district management levy fund for any mechanism that assists a district in merely *avoiding* a loss was not

irrational, illogical, or wholly unjustifiable. Not only is the department's interpretation dictated by the language of the statute, such a dramatic expansion of a district's ability to transfer expenses out of its general formula funding would undermine the limitations on spending imposed by the school finance formula.

We also reject the association's argument that the legislature intended to give districts wide latitude in spending the district management levy funds because section 296.7(1) authorizes the use of noninsurance mechanisms—self-insurance plans and local government risk pools. *See* Iowa Code § 296.7(5) (stating a self-insurance program and a local government risk pool are "not insurance" and not subject to regulation under Iowa's insurance laws). Section 298.4(3) only authorizes expenditures for "*insurance* agreements authorized by section 296.7," and section 296.7 only authorizes school districts to enter into specifically described "*insurance* agreements." (Emphasis added.) We think the legislature's use of the term "*insurance* agreements" in both statutes demonstrates its intent that the self-insurance programs and risk pools permitted by section 296.7(1) be alternatives to traditional insurance and not arrangements with a wholly different purpose.

A review of pertinent authorities reveals that self-insurance and risk pools, while not "insurance," are recognized alternatives to insurance that are designed to accomplish the same purpose as the purchase of an insurance policy: protection against risks of loss. As one treatise explains:

> In self-insurance the company, governmental entity or individual chooses not to purchase insurance but rather retains the *risk of loss*. In order to protect against *losses*, the self-insured will often set aside funds on a regular basis to provide its own pool from which *losses* will be paid. This can be analogized to the situation where a party purchasing

> traditional insurance pays premiums to the insurer on a regular basis. However, in a self-insurance situation there is no shifting of the risk from the individual person or company to a larger group.

1 *Appleman on Insurance 2d* § 1.3, at 10 (emphasis added); *accord St. John's Reg'l Health Ctr. v. Am. Cas. Co.*, 980 F.2d 1222, 1225 (8th Cir. 1992) (stating in a self-insurance program, "the *risk of loss*" is retained by the person who bears the risk (emphasis added)); *State v. Continental Cas. Co.*, 879 P.2d 1111, 1116 (Idaho 1994) ("Self-insurance occurs when an entity, rather than purchasing insurance to cover potential *losses*, elects to pay off its losses as they arise, or to set aside fixed sums into a reserve account to pay off intermittent losses." (Emphasis added.)); *Cordova v. Wolfel*, 90 P.2d 1390, 1392 (N.M. 1995) (stating "self-insurance is a process of risk retention whereby an entity 'set[s] aside assets to meet foreseeable future *losses*' " (emphasis added) (quoting Robert E. Keeton & Alan I. Widiss, *Insurance Law: A Guide to Fundamental Principles, Legal Doctrines and Commercial Practices* § 1.3, at 14 (1988))); *Physicians Ins. Co. v. Grandview Hosp. & Med. Ctr.*, 542 N.E.2d 706, 707 (Ohio Ct. App. 1988) ("Self-insurance is the retention of the *risk of loss* by the one upon whom it is directly imposed by law or contract." (Emphasis added.)); *Black's Law Dictionary* 807 (defining "self-insurance" as "[a] plan under which a business sets aside money to cover any *loss*" (emphasis added)). Thus, self-insurance, like an insurance policy, contemplates protection against a risk of loss.

Local government risk pools commonly have the same purpose. In *City of West Branch v. Miller*, 546 N.W.2d 598 (Iowa 1996), this court discussed a risk pool that had been formed by county governments. The pool self-funded certain risks and purchased private insurance for other risks. *City of West Branch*, 546 N.W.2d at 599. We observed that, with

respect to the self-funded coverages in the risk pool, "the pool pays the claims from the pool of money collected from pool members. In effect, pool members share and pay the claims." *Id.* at 603; *accord Dobrowolska ex rel. Dobrowolska v. Wall,* 530 S.E.2d 590, 595 (N.C. Ct. App. 2000) (holding that in order to constitute a risk pool, the risks of two or more municipalities must be put in one pool for payment of all claims of all entities). Thus, the purpose of risk pooling is to spread the risk of loss. Consequently, local government risk pools are simply another way for districts to protect against a risk of loss in lieu of purchasing a policy of insurance.

We conclude the inclusion of self-insurance and risk pools in section 296.7(1) does not indicate a legislative intent to broaden permissible expenditures from the district management levy fund beyond those associated with protecting against risks of loss traditionally covered by insurance policies. Given the commonly understood meaning of risk in relation to insurance, self-insurance, and risk pooling, the department was not irrational, illogical, or wholly unjustified in refusing to expand the definition of "risk" to include an arrangement that does not involve an actual loss.

**IV. Summary.**

Because the department has clearly been vested with discretion to interpret sections 298.4 and 296.7, we give deference to the department's interpretation of these statutes and will reverse that interpretation only if irrational, illogical, or wholly unjustifiable. We conclude the department's interpretation of these statutes does not meet this standard for reversal. Accordingly, we affirm the declaratory rulings of the department and the auditor that school districts may not use district

management levy funds to pay the management fees required for participation in IJUMP's fleet services program.

**AFFIRMED.**