# IN THE SUPREME COURT OF IOWA

No. 08–1628

Filed August 13, 2010

ANDOVER VOLUNTEER FIRE DEPARTMENT
and **TRAVELERS INSURANCE COMPANY,**

     Appellees,

vs.

**GRINNELL MUTUAL REINSURANCE COMPANY,**

     Appellant.

---

Appeal from the Iowa District Court for Polk County, Eliza J. Ovrom, Judge.

Workers' compensation insurer for volunteer fire department appeals district court decision reversing ruling by workers' compensation commissioner finding a volunteer firefighter died in the course of his employment both as volunteer firefighter and as farmhand. **DISTRICT COURT JUDGMENT AFFIRMED AND CASE REMANDED WITH INSTRUCTIONS.**

Charles A. Blades of Scheldrup, Blades, Schrock, Smith, and Aranza, P.C., Cedar Rapids, for appellant.

Aaron T. Oliver of Hansen, McClintock & Riley, Des Moines, for appellees.

**CADY, Justice.**

Justin Faur died attempting to save the life of another person. He was twenty-three years old. His heroic efforts denied him a full life, but left behind the true measure of his abundant character. These efforts are documented in this opinion because they serve as the backdrop to a legal dispute over the interpretation of Iowa Code section 85.61(7)(*a*) (2009).[1] We resolve the dispute by affirming the decision of the district court.

## I. Background Facts and Proceedings.

Justin Faur died ten days after he sustained an anoxic brain injury from the inhalation of methane gas. He was employed by Johnson Valley Beef, a farm corporation owned by Dwight Johnson and located in rural Andover. Justin worked as a farmhand on the farm. The farm operation consisted of raising crops and livestock, including approximately 1200 head of cattle. Justin was a dependable and reliable worker and maintained a close relationship with Dwight and his wife, Sherril.

Justin was also a volunteer firefighter for the Andover Volunteer Fire Department. As a volunteer firefighter, Justin wore a pager issued by the volunteer department. The pager allowed him to be notified when his services as a volunteer firefighter were needed. Each volunteer firefighter normally had the responsibility to promptly report to duty when paged.

---

[1]Although the compensable event in this case occurred in 2005, we will refer to the 2009 Code unless otherwise noted for ease of reference to the applicable language at issue. Iowa Code section 85.61(7) did not separate the text into subsections until 2008. *See* 2008 Iowa Acts ch. 1031, § 91 (codified at Iowa Code § 85.61(7) (2009)). The content of section 85.61(7) remained otherwise unchanged by the amendment.

The pager system was tied to the county 911 emergency system. The volunteer fire department was part of the enhanced 911 emergency services system in the county. All emergency calls from the public were directed to the communication center in Clinton, and a dispatcher at the center would notify the appropriate emergency responder. When a call required the services of the fire department, the dispatcher would send a page to the volunteer firefighters. Some volunteer firefighters carried their uniform and equipment in their vehicles and could proceed directly to the scene of the emergency in response to a page. Other volunteer firefighters kept their uniform and equipment at the fire station and would first proceed to the station in response to a page before going to the scene of the emergency. Justin kept his uniform and equipment at the station.

On April 16, 2005, Justin and Dwight spent most of the day cleaning a manure pit under a cattle confinement barn on the farm. After draining and washing the pit, Dwight apparently climbed into the manure pit to retrieve a chain that had dropped and was overcome by methane fumes. Methane gas inhibits the ability of a person to breathe when inhaled into the lungs, and the effects can be immediate and dramatic. In addition to its natural state, it is produced by the fermentation of organic matter such as manure. Methane gas produced by manure can be highly toxic in a closed environment, especially when the manure is wet.

Justin ran to the farmhouse, approximately 150 yards from the barn. He told Sherril that Dwight had fallen into the pit and to call 911. Justin promptly returned to the barn and apparently attempted to remove Dwight from the pit on his own. There were no witnesses, however, to the event. Justin was found a few minutes later lying face

down in the pit near Dwight. Like Dwight, he had been overcome by methane gas. The gas rendered Justin unconscious and unresponsive.

The men were removed from the pit after rescue personnel arrived, which included members of the Andover Volunteer Fire Department. The Andover volunteer firefighters were paged one minute and eight seconds after the law enforcement center received the 911 call from Sherril. It is unknown if the page was sent to the volunteer firefighters before Justin was overcome by methane gas.

Dwight died four days after the incident. Justin died in the hospital ten days later. He never regained consciousness. He posthumously received a national award for his heroic actions from the Carnegie Foundation.

The workers' compensation carrier for Johnson Valley Beef, Grinnell Mutual Reinsurance (Grinnell), paid the workers' compensation benefits for Justin's injuries and death. Grinnell then sought contribution or indemnity from the workers' compensation carrier for the Andover Volunteer Fire Department, Travelers Insurance Company (Travelers). Grinnell claimed Justin was acting as a volunteer firefighter at the time of his death because he had been "summoned to duty as a volunteer fire fighter" in accordance with Iowa Code section 85.61(7)(*a*) once he witnessed that Dwight had fallen unconscious into the manure pit.

A deputy workers' compensation commissioner determined Justin's death arose out of and in the course of his employment with both Johnson Valley Beef and the Andover Volunteer Fire Department. In reaching this decision, the deputy concluded a volunteer firefighter is not in the course of employment for purposes of Iowa Code section 85.61(7)(*a*) until summoned by a third party. However, he determined

Justin was summoned to duty by the dispatcher either before or after he was overcome by the methane gas. In any event, the deputy determined the summons preceded his death, which meant that some of the injuries he sustained that led to his death occurred in the course of employment as a volunteer firefighter. As a result, the deputy found Travelers was responsible for one-half of the workers' compensation benefits payable as the result of Justin's injuries and death.

Travelers appealed.[2] The workers' compensation commissioner affirmed the decision of the deputy, but on different grounds. The commissioner concluded the timing of the page was not critical to the determination of coverage under section 85.61(7)(*a*) because Justin had been summoned to duty as a volunteer firefighter by the circumstances themselves. The commissioner determined that the failure to allow volunteer firefighters to call themselves to duty after witnessing an emergency situation would have the absurd result of deterring them from immediately rendering assistance upon encountering an emergency. The commissioner stated:

> For by acting immediately the firefighter would jeopardize the firefighter's or any dependent's entitlement to workers' compensation benefits if the firefighter were injured while so acting. Given that result from immediate action, the rational volunteer firefighter would call 911 and then wait to receive a summons from the appropriate entity before initiating actions consistent with a firefighter's duties to the general public. Certainly, in situations of imminent peril minutes and seconds do matter. A volunteer firefighter's failure to act immediately could well increase the peril to the public or decrease the possibility of averting disaster. Common sense compels the conclusion that the legislature did not intend such absurd results.

---

[2]Grinnell also cross-appealed, claiming Justin acted solely in his capacity as a volunteer firefighter at the time of his injury. Grinnell abandoned the claim on appeal.

The commissioner determined a volunteer firefighter is summoned to duty when "a reasonable firefighter faced with the circumstances presented would have felt called upon to act in a manner consistent with the duties a voluntary firefighter assumes as regards the general public."

Travelers sought judicial review. The district court rejected the ruling of the commissioner. It concluded a volunteer firefighter cannot be summoned to duty by circumstances, but can only be summoned by the fire department or some other official channel. It concluded that Justin could only be summoned in this case by a page from the emergency communication center. It remanded the case to the workers' compensation commissioner for further proceedings under the correct legal standard. Grinnell appealed.

## II. Scope of Review.

The standards of chapter 17A are applied to determine whether the conclusions we reach are the same as those of the district court. *Mycogen Seeds v. Sands*, 686 N.W.2d 457, 464 (Iowa 2004). If the conclusions are the same, we affirm. *Id.* Otherwise, we reverse. *Id.* Our review of agency decisions begins with proper direction from Iowa Code chapter 17A. *Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 10 (Iowa 2010). Ordinarily, "the interpretation of a statute is a pure question of law over which agencies are not delegated any special powers by the General Assembly . . . ." Arthur E. Bonfield, *Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 62 (1998). However, we recently clarified that we defer to the agency's interpretations of statutes when the legislature has clearly vested the agency with the proper authority to do so based on the agency's expertise on the subject matter. *Renda,* 784 N.W.2d at 11. We do not focus our inquiry on whether the

agency does or does not have the broad authority to interpret the act as a whole. *Id.* at 10. Instead, when determining whether the legislature has clearly vested the agency with authority to interpret, "each case requires a careful look at the specific language the agency has interpreted as well as the specific duties and authority given to the agency with respect to enforcing particular statutes." *Id.* at 13.[3] If we find the legislature has clearly vested the agency with interpretive authority for the phrase under consideration, we reverse only if the interpretation is "irrational, illogical, or wholly unjustifiable." Iowa Code § 17A.19(10(*l*). On the other hand, if we do not find that the legislature has clearly granted the agency authority to interpret, we do not defer to the agency's interpretation. *Id.* § 17A.19(11)(*b*). We will reverse if we find the agency's decision was "[b]ased upon an erroneous interpretation of a provision of law." *Id.* § 17A.19(10)(*c*).

In the absence of an explicit grant of authority to interpret in the agency's enabling statute, we turn to other indications that the interpretation of the applicable law has been clearly vested with the agency. In this case, we are unable to find any indication the legislature intended to grant the workers' compensation commissioner the authority

---

[3]Our prior cases have appeared to treat the workers' compensation commissioner differently. In *Mycogen Seeds*, we held the legislature had not delegated special authority to interpret any statute to the workers' compensation commissioner. 686 N.W.2d at 464. The same year, we made a similar statement broadly excepting the commissioner from any case-by-case approach to deference. *P.D.S.I. v. Peterson*, 685 N.W.2d 627, 633 (Iowa 2004) ("We see nothing in the workers' compensation statutes that convinces us that the legislature has delegated any special powers to the agency regarding its interpretation of . . . statutes."). Most recently, we explicitly disavowed the case-specific analysis for the workers' compensation commissioner's interpretation of any workers' compensation statutes. *Rojas v. Pine Ridge Farms, L.L.C.*, 779 N.W.2d 223, 231 (Iowa 2010) ("It is well-settled law that the legislature did not clearly vest the workers' compensation commissioner with the power to interpret the workers' compensation statutes."). In accordance with our clarification of the appropriate analysis for all agency discretion decisions in *Renda*, we will examine the workers' compensation commissioner's interpretations on a case-by-case basis.

to interpret the phrase "summoned to duty." Generally, "summoned to duty" is not a phrase "uniquely within the subject matter expertise of the agency." *Renda*, 784 N.W.2d at 13. In fact, in interpreting "summoned to duty," the commissioner relied on social policy reasons rather than special subject matter expertise to conclude a volunteer firefighter may summon himself or herself to duty when an emergency arises. Moreover, the phrase has a broad range of meanings that touches several areas of the law, which makes it unlikely the legislature intended to authorize the commissioner to interpret the phrase by granting the commissioner general rule-making and enforcement powers. *See* Iowa Code § 86.8(1) (establishing the commissioner's duty to "[a]dopt and enforce rules necessary to implement" workers' compensation laws). Finally, we can find no other feature of the statute that reveals a clear intent to vest authority with the commissioner. Accordingly, we do not give deference to the commissioner's interpretation of the statute in this case, Iowa Code § 17A.19(11)(*b*), and we will reverse or otherwise grant relief from the agency action if the rights of the appellant have been prejudiced because of an erroneous interpretation of the statute, *id.* § 17A.19(10)(*c*).

### III. Statutory Interpretation.

The resolution of this case requires us to interpret Iowa Code section 85.61(7)(*a*). The statute provides:

> Personal injuries sustained by a volunteer fire fighter arise in the course of employment if the injuries are sustained at any time from the time the volunteer fire fighter is summoned to duty as a volunteer fire fighter until the time the volunteer fire fighter is discharged from duty by the chief of the volunteer fire department or the chief's designee.

Iowa Code § 85.61(7)(*a*).

Grinnell claims a volunteer firefighter can be "summoned to duty" as a volunteer firefighter by circumstances. Travelers asserts a volunteer

firefighter can only be "summoned to duty" under the statute by a means or method approved by the fire chief to call a volunteer firefighter to duty, which in this case would have been an audible page.

We begin our resolution of this case with a firm understanding of our task. It is only to determine the intent of the legislature. *In re Det. of Shaffer*, 769 N.W.2d 169, 173 (Iowa 2009). Fundamentally, this task is tied to the separation-of-powers doctrine, as well as two important underlying principles that the legislature makes the law and courts interpret the law. Courts are given the role to interpret statutes enacted by the legislature because even the most carefully drafted law can never eliminate all uncertainty when applied to future unanticipated circumstances. *Teamsters Local Union No. 421 v. City of Dubuque*, 706 N.W.2d 709, 713 (Iowa 2005). Uncertainty is inherent in statutes largely because it is inherent in the English language itself.[4] *See* Ronald Benton Brown & Sharon Jacobs Brown, *Statutory Interpretation: The Search for Legislative Intent* 2 (2002) (noting statutory language is often unclear "because the English language by its very nature . . . is an inherent breeding ground for ambiguity"). Thus, courts resolve uncertainties in the application of statutes, but only in a way that captures the will of the legislature.

The first task for courts in interpreting statutes is to identify the presence of an ambiguity. *Larson Mfg. Co. v. Thorson*, 763 N.W.2d 842, 859 (Iowa 2009). Of course, if no ambiguity exists, the statute is

---

[4]A major reason effective communication can be difficult is because a single word frequently represents numerous distinct meanings. Jon L. Ericson & Robert F. Forston, *Public Speaking as Dialogue: Readings and Essays* 40 (1970). For example, the *Oxford Dictionary* lists an average of twenty-eight separate meanings for the five hundred most commonly used words in the English language. *Id.* The difficulty in communicating with clarity was perhaps best captured by Mark Twain, when he wrote: "The difference between the *right word* and the *almost right word* is the difference between lightning and the lightning bug." *Id.* at 39.

rationally applied as written. *Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Shell Oil Co.*, 606 N.W.2d 376, 379 (Iowa 2000).

In this case, the ambiguity in the statute is found in the application of the phrase "summoned to duty." Grinnell claims a volunteer firefighter can be "summoned to duty" by the circumstances encountered by a volunteer firefighter that present the type of danger to which a volunteer firefighter has been trained to respond. Travelers asserts a volunteer firefighter can only be "summoned to duty" by the fire chief or someone else authorized to call a volunteer firefighter to duty. We have said that an ambiguity exists when more than one reasonable interpretation is presented by the circumstances. *Shell Oil Co.*, 606 N.W.2d at 379–80 ("[I]f reasonable minds could disagree over the meaning of a word or phrase of a statute, the statute is ambiguous . . . ."). Because the separate meanings claimed by the parties can be attributed to "summoned to duty," we find ambiguity exists in this case. *See Webster's Third New Int'l Dictionary* 2290 (unabr. ed. 2002) (providing five definitions for "summon"). Numerous intrinsic aids can help courts discover the intent of a statute in the face of an ambiguity. In this case, two rules of construction are particularly pertinent. First, we interpret statutes in their context. *Griffin Pipe Prods. Co. v. Guarino*, 663 N.W.2d 862, 865 (Iowa 2003). Second, undefined words used in the statute are normally given their ordinary and common meaning. *Mason v. Schweizer Aircraft Corp.*, 653 N.W.2d 543, 548 (Iowa 2002).

**A. Context of Statute.** The context of a statute is an important consideration in the search for legislative intent because "[w]ords may have different meanings when used in the context of a special subject." 2A Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory*

*Construction* § 47:27, at 443 (7th ed. 2007) [hereinafter *Statutes and Statutory Construction*]. Additionally, we look to the statute as a whole to make sure our interpretation is harmonious with the entire legislative enactment. *Griffin Pipe Prods. Co.*, 663 N.W.2d at 865.

The statute in dispute is found within the definitions section of the Workers' Compensation Act. It is a subsection enacted in 1985 as a part of a broader definition of the phrase "personal injury arising out of and in the course of employment" and is part of an even larger body of law extending workers' compensation benefits to volunteer firefighters. *See* 1985 Iowa Acts ch. 46, § 1 (codified at Iowa Code § 85.61(6) (1987)) (entitled "Time of Volunteer Fire Fighter's Employment"); *see also* Iowa Code § 85.61(7). While regular firefighters across Iowa are excluded from workers' compensation benefits, the legislature included volunteer firefighters within the workers' compensation statute in 1945.[5] *See* 1945 Iowa Acts ch. 75, §§ 2, 3 (codified at Iowa Code §§ 85.1(4), .61(8) (1946)) (defining "volunteer firemen" and providing for compensation under the Workmen's Compensation Law). In that year, the legislature specifically excepted volunteer firefighters from the statutory exclusion for firefighters and amended section 85.61 by adding a definition of "volunteer fireman," which also made it explicitly clear that a volunteer firefighter could not be excluded from benefits as a casual employee. *Id.*

When volunteer firefighters were included in Iowa's workers' compensation system, they also became subject to the body of law governing entitlement to benefits. This law includes the basic principle

---

[5]In *Heiliger v. City of Sheldon*, we held that volunteer firefighters were impliedly excluded from the protections of the workers' compensation statute by the general statutory exclusion for firefighters. 236 Iowa 146, 162, 18 N.W.2d 182, 190 (1945). A week later, the legislature amended the statute to specifically exempt volunteer firefighters from the general exclusion for firefighters. Maurice H. Merrill, *Fifteen Years More of Workmen's Compensation in Iowa*, 32 Iowa L. Rev. 1, 16 (1946).

of compensation that employers are required to pay workers' compensation only for personal injuries sustained by an employee "arising out of and in the course of employment." Iowa Code § 85.3(1). Generally, we have indicated an injury "arises out of" employment when a causal connection exists between the employment and the injury. *Thayer v. State*, 653 N.W.2d 595, 599 (Iowa 2002). We have said the injury "arises in the 'course of employment' when the injury and the employment coincide as to time, place, and the circumstances." *Id.* at 600.

Notwithstanding, the legislature has contributed its own definition of the phrase "personal injury arising out of and in the course of the employment." Under section 85.61(7), the legislature identified two components to the definition. First, the phrase includes "injuries to employees whose services are being performed on, in, or about the premises" of the employer. Iowa Code § 85.61(7). Second, the phrase includes "injuries to those who are engaged elsewhere in places where their employer's business requires their presence and subjects them to dangers incident to the business." *Id.* Clearly, the legislature understood that compensable injuries can occur both on and off work premises. This definition is consistent with our long-standing approach used to evaluate the "in the course of employment" prong. Generally, an injury arises "in the course of employment" when an injury is within the time period of the employment, the space boundaries of the employment, and in the course of an activity connected to the employment. *Waterhouse Water Conditioning, Inc. v. Waterhouse*, 561 N.W.2d 55, 57 (Iowa 1997)); *see also* 1 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 12:01, at 12–1 (2010) ("The course of employment requirement . . . demands that the injury be shown to have

arisen within the time and space boundaries of the employment, and in the course of an activity whose purpose is related to the employment.").

Under section 85.61(7)(*a*), however, the legislature has provided a special, more narrow "course of employment" rule for volunteer firefighters. Instead of relying on time, place, and circumstances to determine "course of employment," section 85.61(7)(*a*) reduces "course of employment" to a single factor—time period of employment. It provides that

> [p]ersonal injuries sustained by a volunteer fire fighter arise in the *course of employment* if the injuries are sustained *at any time from* the time the volunteer fire fighter is summoned to duty as a volunteer fire fighter *until the time* the volunteer fire fighter is discharged from duty by the chief of the volunteer fire department or the chief's designee.

Iowa Code § 85.61(7)(*a*) (emphasis added). Thus, the legislature has adopted a more arbitrary "course of employment" rule for volunteer firefighters covering a time period beginning with the summons to duty and ending with the discharge from duty. Any other factors and further circumstances are removed from consideration.

It is understandable that the legislature would want to develop a special "course of employment" rule for volunteer firefighters. Unlike most employees, the duties of volunteer firefighters are not normally connected to a particular premise of the employer. Instead, volunteer firefighters are called to duty at all times of the day and night and at a variety of locations. The general definition of "arising out of and in the course of employment" under section 85.61(7) captures volunteer firefighters once they arrive at the scene of an emergency, but does not specifically cover their activities between the time they are called to report to duty and the time they arrive at the scene of an emergency. Nevertheless, from the instant a volunteer firefighter hears an alarm and

proceeds to the scene of an emergency, the volunteer firefighter is exposed to special risks connected with employment. *See Comments on Recent Cases*, 32 Iowa L. Rev. 755, 805 (1947).

As a general rule, workers' compensation does not cover an injury sustained by an employee on the way to or from work. *Bailey v. Batchelder*, 576 N.W.2d 334, 339 (Iowa 1998). Although somewhat arbitrary, the rule has its logic. *See id.* For purposes of workers' compensation, the hazards encountered going to or returning from the place of work are not normally incident to employment. *Id.* When an employee reaches a job site, however, there is a physical and tangible connection to the employment environment. *Id.* Thus, while traveling to or from work an employee is not ordinarily considered to be "in the course of employment." *Halstead v. Johnson's Texaco*, 264 N.W.2d 757, 759 (Iowa 1978).

The situation of a volunteer firefighter, however, is unique. A volunteer firefighter not only has special risks produced by rendering services at the scene of an emergency, but also in going to and even returning from the scene of the emergency. For example, the need for speed in responding to a call is one risk connected with employment as a volunteer firefighter. *See Comments on Recent Cases*, 32 Iowa L. Rev. at 804. Thus, section 85.61(7)(*a*) makes it clear that volunteer firefighters do not fall within the "going and coming" rule applicable to most other employees. Instead, the legislature adopted a rule that the course of employment begins when the volunteer firefighter is "summoned to duty."

This context permits us to make certain observations helpful to our understanding of the intent of the statute. The phrase "summoned to duty" only exists in the statute to establish the point in time when the

"course of employment" begins for volunteer firefighters for the purposes of workers' compensation. Additionally, the phrase contemplates that the summons is preceded by a decision for the period of employment to begin. Normally, the decision for work to commence rests with the employer, not the employee, especially where the employer is made responsible for injuries sustained by employees "arising out of and in the course of employment."

Furthermore, the duty that is the subject of the summons under the statute is the duty "as a volunteer fire fighter." The statute then defines a volunteer firefighter as a "member of an organized volunteer fire department in this state and any other person performing services as a volunteer fire fighter . . . at the request of the chief or other person in command of the fire department." Iowa Code § 85.61(10). The first portion of the definition reveals volunteer firefighters are members of a group of volunteer firefighters. Thus, the summons to duty relates to duty as a member of a group, not as an individual. Moreover, the second portion of the definition reveals the services of all volunteer firefighters are performed at the request of a person in command of the group of volunteer firefighters. *See generally Teamsters Local Union No. 421*, 706 N.W.2d at 715 (describing and applying the interpretive aid *ejusdem generis* by tying the meaning and purpose of general words to the specific words that precede to help define a class of statutorily described individuals). We find nothing in the background or context of the statute to reveal an intent for volunteer firefighters to summon themselves to duty.

We recognize section 85.61(7)(*a*) does make it clear that a volunteer firefighter must be "discharged from duty by the chief of the volunteer fire department or the chief's designee," yet the same qualifying phrase

fails to follow the "summoned to duty" component of the statute. A common intrinsic aid for statutory interpretation provides that referential and qualifying phrases refer solely to the last antecedent. *Statutes and Statutory Construction* § 47:33, at 487. However, this rule applies only when no contrary intention is apparent. *Id.* Moreover, while the qualifying phrase relating to the fire chief or the chief's designee may be restricted to the "discharged from duty" component of the statute, the restriction does not aid in identifying the scope and nature of the "summoned to duty" component of the statute. For sure, the legislature may have intended not to use the same qualifying language for the "summoned to duty" component of the statute because different communities may have different methods to call or notify volunteer firefighters of an emergency, especially at the time the statute was enacted in 1985. Thus, the question that remains is whether the legislature intended for volunteer firefighters to summon themselves to duty based on circumstances that they may encounter in the course of each day. This question is not resolved in any way by the rule of statutory construction relating to referential and qualifying words.

**B. Common Meaning.** Undefined words in a statute are usually construed in accordance with their ordinary and common meanings. *Statutes and Statutory Construction* § 47:27, at 443–46; *Mason*, 653 N.W.2d at 548. However, when a word of common usage has more than one meaning, the meaning that best conforms to the purpose of the statute is used to construe the statute. *See Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004) ("Absent a statutory definition or an established meaning in the law, words in the statute are given their ordinary and common meaning by considering the context within which they are used.").

The word "summoned" has a variety of meanings. *See Webster's Third New Int'l Dictionary* 2290 (providing five definitions for "summon"). Most of the meanings of the word relate to a call or command by a third party. *Id.* Yet, a secondary meaning allows the word to be used in the context of an internal call to action, as when a person summons his or her courage. *Id.* In the context of the time period of employment for the purposes of workers' compensation benefits, the common meaning of "summoned to duty" as a command from another fits better within the legislative scheme than internal forces that would summon a Good Samaritan to respond and render aid after witnessing an accident or other emergency. There is simply nothing in the statute to indicate the legislature wanted the forces that motivate a Good Samaritan to render aid in the face of emergency to commence the course of employment for a volunteer firefighter who happens to witness an accident and renders aid. Instead, we believe the intent of the legislature was to employ a straightforward, easily applied rule that the course of employment for a volunteer firefighter commences when the volunteer firefighter receives a call initiated through official communications to report for duty.

Importantly, the legislature adopted a rule that removed any consideration of the surrounding circumstances relating to the actual duties of employment. Having specifically removed such circumstances from the "course of employment" test for volunteer firefighters, the legislature left no indication of an intention to reopen the rule for such circumstances to be considered in the event a volunteer firefighter witnesses an accident or other emergency. The test adopted by the legislature captures the goal of protecting volunteer firefighters in the unique circumstances of their employment, and no legislative intent exists to show the legislature further intended to use the workers'

compensation statute to broaden the "course of employment" rule to embrace the principle of a Good Samaritan.

After considering the history and purpose of the statute providing workers' compensation benefits to volunteer firefighters, along with the ordinary and common meaning of "summon" in the context of the statute, we hold that a volunteer firefighter must be called to duty by a third party authorized by the fire chief before injuries that arise in efforts to rescue are covered by workers' compensation. Additionally, a summons places a volunteer firefighter in the "course of employment" once it is communicated to the volunteer firefighter. The relevant inquiry under the statute is whether Justin was summoned to duty as a volunteer firefighter by the 911 dispatcher prior to receiving his injuries. Any other approach would be contrary to the legislative intent expressed in section 85.61(7)(*a*).

## IV. Receipt of Summons.

The next question that necessarily follows is whether the summons to duty must be heard or received by the volunteer firefighter. This issue could arise on remand, as illustrated by the deputy workers' compensation commissioner's determination that Justin was in the course of employment because the page would have reached him prior to his death.

At this point in the analysis, there are few interpretive aids available to guide us. Yet, those that exist remain important. We presume the legislature intended for the statute to yield reasonable results. *W.P. Barber Lumber Co. v. Celania,* 674 N.W.2d 62, 67 (Iowa 2003). We therefore give this statute its plain meaning and avoid creating impractical or absurd results. *Heartland Express v. Gardner,* 675 N.W.2d 259, 262 (Iowa 2003). We also keep the entire statute in

mind in interpreting the particular provision at issue. *Iowa Ass'n of Sch. Bds. v. Iowa Dep't of Educ.*, 739 N.W.2d 303, 309 (Iowa 2007). In the end, we strive to interpret the statute consistent with its purpose. *IBP, Inc. v. Harker*, 633 N.W.2d 322, 325 (Iowa 2001).

On one hand, it is conceivable the legislature could have considered receipt of the summons to be unnecessary for a volunteer firefighter. Yet, our rules of interpretation do not lead to such a result. The statute specifically refers to "the time the volunteer fire fighter is summoned to duty." Iowa Code § 85.61(7)(*a*). It does not refer to the time the chief or the chief's designee summoned the volunteer firefighter to duty. *See id.* The language used by the legislature in enacting the statute clearly focuses on whether the particular injured volunteer firefighter was "summoned," not whether a summons was sent.

Additionally, the statute could produce absurd results if it were interpreted not to require receipt of the summons. Such an interpretation would mean an injury sustained by a volunteer firefighter in the course of an activity unrelated to the duties of a volunteer firefighter would be an injury that occurs "in the course of employment" as a volunteer firefighter. For example, if a volunteer firefighter was injured after being struck by a speeding boat while water skiing on a lake and it was later discovered that his or her pager left behind on the dock had activated with a call to duty just prior to the accident, it would be absurd to conclude the volunteer firefighter was in the course of employment at the time of the injury under the statute.

The receipt requirement is also consistent with the overall purpose of the workers' compensation statute to provide compensation for injuries that arise out of and in the course of employment. Workers' compensation was not intended to provide compensation for injuries in

the course of activities detached from employment. More specifically, section 85.61(7)(*a*) was enacted to provide coverage for volunteer firefighters while responding to the call to duty. Clearly, a volunteer firefighter cannot respond to the call of duty until the volunteer firefighter learns of the call. Thus, the receipt requirement is consistent with the purpose of the statute.

At the same time, we recognize the statute expresses no requirement that the *official* summons be received by the volunteer firefighter. Instead, to fulfill the purpose of the statute defining "in the course of employment," it is only important that the employer send the summons and the volunteer firefighter acquire knowledge that a summons to duty has been issued. This approach provides a reasonable interpretation of the statute, is consistent with the entire statute, and meets our goal of interpreting workers' compensation statutes consistently with the humanitarian objective of providing compensation for injured workers.

**V. Conclusion.**

We affirm the decision of the district court. The commissioner applied an incorrect legal test in rendering his decision. We remand the case to the district court to further remand the matter to the commissioner for further proceedings consistent with this opinion. It is for the commissioner to resolve this dispute between two insurance companies by applying the statute as interpreted in this opinion to the facts to decide if Justin's injuries arose in the course of his employment as a volunteer firefighter.

**DISTRICT COURT JUDGMENT AFFIRMED AND CASE REMANDED WITH INSTRUCTIONS.**

All justices concur except Hecht, Wiggins, and Baker, JJ., who concur specially.

**HECHT, Justice (concurring specially).**

I write separately because, although I agree this case must be remanded to the commissioner, I cannot agree with one aspect of the majority's interpretation of Iowa Code section 85.61(7)(*a*). The fighting issue in this case requires a determination whether Justin Faur sustained a personal injury "at any time from the time [he was] summoned to duty . . . until the time [he was] discharged from duty by the chief of the volunteer fire department or the chief's designee." Iowa Code § 85.61(7)(*a*). The commissioner's interpretation posited broadly that a volunteer firefighter can be summoned to duty under the statute by any circumstances that could lead a reasonable volunteer firefighter "to act in a manner consistent with the duties a volunteer firefighter assumes as regards the general public." Accordingly, under the commissioner's interpretation of the statute, the compensability of Faur's claim as a volunteer firefighter does not turn on whether the pager sounded notice of the dispatcher's call before Faur was injured by the gas in the atmosphere of the manure pit.

The majority rejects the commissioner's interpretation. Repudiating the notion that a volunteer firefighter can be summoned to duty by mere circumstances, the majority concludes the legislature intended volunteer firefighters to be without workers' compensation protection until "a third party authorized by the fire chief" calls them to duty. I agree with this portion of the majority's analysis as I believe the legislature clearly expressed the boundaries of "the course of employment." The course commences on the front end with the issuance of a call to duty from an authorized person to members of the force (the act of "summoning"). In this case the summons was issued by a

dispatcher sixty-eight seconds after a 911 call was placed at Faur's direction. Although one witness testified that Faur could have made the return trip from the house to the pit in thirty seconds, another opined it would have taken Faur more than a minute to cover the distance because he was wearing knee-high "manure" boots and was winded as a consequence of the trip from the pit to the house. When he arrived back at the pit, he instructed the victim's daughter to summon additional assistance before he began to climb down a piece of machinery into the nine-foot deep pit. In my view, a reasonable fact finder could on remand find that Faur sustained an injury after the dispatcher issued the summons to duty to Faur and the other members of the Andover Volunteer Fire Department who were available to respond to the emergency.

I write separately because I believe the majority's interpretation of section 85.61(7)(*a*) adds to the statute language requiring a volunteer firefighter prove he or she received the department's call to duty.[6] This interpretation results in an embellishment of the words chosen by the legislature and is justified, the majority suggests, by a purpose to avoid an illogical, impractical, or absurd result. I strongly disagree.

There is nothing illogical, impractical, or absurd about an interpretation of the statute that commences the course of employment with an authorized person's sounding of a call to action to members of a volunteer fire department who are available for duty. As the majority has acknowledged, the legislature chose to except these public servants from the operation of the going-and-coming rule. I view section 85.61(7)(*a*) as

---

[6]This element of the claim is characterized elsewhere in the majority opinion as proof that the firefighter "acquire[d] knowledge that a summons to duty has been issued."

unmistakable evidence of a legislative purpose to expand the protection of the workers' compensation statute. The majority's interpretation of the statute contravenes this clear legislative purpose by adorning the statute with words ("receive" and "knowledge") not expressed and, in my view, not intended by the legislature. This embellishment achieves a diminution of the zone of protection for volunteer firefighters, a result inconsistent with the legislative purpose, and I therefore reject it.

An interpretation of the statute that commences a volunteer firefighter's course of employment with the employer's sounding of a call to service is more faithful to the words chosen by the legislature and the clear legislative purpose to expand workers' compensation protection for volunteers. The clear legislative purpose to expand the protection for volunteers who risk their lives in the service of others amply explains why the legislature chose to commence the course of employment in this context with the employer's issuance of a call to service. This purpose is illustrated by the legislature's omission of a requirement that the volunteer receive the call as a condition of commencement of the course of employment, an omission that does not result in such asymmetry as to produce illogical, impractical, or absurd results.[7] The majority's argument to the contrary uses a strained and inapt "straw-man" hypothetical in which a volunteer who is oblivious to the emergency for which he is imminently to be called to duty and is clearly unavailable to respond to the employer's call to duty because he is not wearing a pager. I agree with the majority that a proper interpretation of the statute

---

[7]The majority finds support for its conclusion that the call to duty is triggered by a volunteer firefighter's receipt or knowledge of the call to duty in the phrase "the volunteer fire fighter is summoned to duty." As volunteers are not called to duty individually, but rather jointly by common dispatch, I believe the majority gives the phrase a significance not intended by the legislature. In my view, the employer's act of issuing the summons to available volunteers triggers the course of employment.

should not support the skier's workers' compensation claim because there is no basis upon which it could be reasonably concluded that the skier was responding to the department's summons or otherwise serving the interests of the employer when the injury occurred. In sharp contrast, it was Faur who discovered the need for an emergency response while wearing his pager, caused the department to be alerted, and diligently positioned himself in the service of his employer to respond to the imminent page which sounded a mere sixty-eight seconds after the 911 call was received by the department's dispatcher. Moreover, Faur knew the call to duty was imminent from the moment he caused the 911 call to be placed and during the entire time he travelled the 150–200 yards from the house to the pit. We should not attribute to the legislature the intent to shield Andover from liability for workers' compensation benefits in the absence of proof that Faur either heard the pager sound or otherwise came to know it had sounded before he was injured while responding to the emergency for which the call to duty issued.

It seems perfectly logical that in furtherance of its purpose to expand the protection of volunteers, the legislature chose a bright-line "trigger" to commence the course of employment. The employer's issuance of the call to duty to available volunteers is readily verifiable and therefore serves as a most practical trigger.[8] Further, an interpretation that commences the course of employment with the issuance of the summons to duty provides protection for volunteers even when, sadly, as in Faur's case, they are unavailable to testify on the

---

[8]Pagers were chosen by the Andover Volunteer Fire Department as the means of summoning its members. I would apply the same reasoning had the department chosen telephones as its preferred means of communication.

question of whether they received the page, or otherwise came to know a summons was sent, before they were injured while clearly in the service of the employer.

The majority's interpretation of the statute should be rejected for yet another reason. This court has in the past fifty years repeatedly affirmed that the workers' compensation statute was enacted to benefit workers and their dependents and that it should, therefore, be interpreted "broadly and liberally in keeping with the humanitarian objective of the statute. We will not defeat the statute's beneficent purpose by reading something into it that is not there, or by a narrow or strained construction." *Holstein Elec. v. Breyfogle,* 756 N.W.2d 812, 815–16 (Iowa 2008); *see also Stumpff v. Second Injury Fund*, 543 N.W.2d 904, 905 (Iowa 1996); *Barton v. Nevada Poultry Co.*, 253 Iowa 285, 289, 110 N.W.2d 660, 662 (1961). Reference to this long-standing rule is conspicuously omitted from the majority's incompatible interpretive effort.[9]

The majority's concern about extending workers' compensation protection to any "Good Samaritan" seems far afield in this case. When Faur became aware of a victim's peril, he was wearing his fire department pager and was therefore available to be summoned to duty at a location within the department's coverage territory. His attempt to rescue the victim commenced only after he went to the nearby house and caused a 911 call to be placed, alerting his department and putting in motion the very protocol that culminated with the sounding of the alert to all available members of the rescue team, sixty-eight seconds later.

---

[9]The majority acknowledges the "humanitarian objective of providing compensation for injured workers," but fails in my view to liberally construe the statute as our case law commits us to do.

Thus, as Faur travelled the 150–200 yards from the house back to the pit, he knew the pager summoning him to the rescue would soon sound. If the pager worn by Faur had not sounded before he arrived at the pit, he knew it would soon sound. If the pager did not sound as Faur climbed down into the pit in an effort to effect the rescue, he knew it would soon sound. That this court would attribute to the legislature an interpretation of section 85.61(7)(*a*) authorizing the commissioner to deny workers' compensation protection to a volunteer firefighter under these circumstances absent proof that the volunteer received the paged call to duty or otherwise knew the summons to duty had issued before he was injured is completely unfathomable and produces a stunningly illogical, impractical, and absurd result which the majority opinion claims to renounce.[10]

For all of these reasons I concur with the conclusion that this case must be remanded to the commissioner but cannot join the majority's interpretation of the statute.

Wiggins and Baker, JJ., join this special concurrence.

---

[10]Even under the majority's erroneous interpretation of the statute, I believe this record engenders a fact question as to whether Faur received the call to duty or had knowledge of the call to duty before he was injured. The call to duty sounded a mere sixty-eight seconds after the 911 call was received. As I have noted above, one witness opined the return trip from the house to the pit would have taken more than a minute. There is evidence in the record from which a reasonable fact finder could find Faur paused to give an instruction to Johnson's daughter before he began to climb down into the pit. In addition to the reasonable inferences from this direct evidence, circumstantial evidence could support a finding that additional time passed as Faur climbed down into the nine-foot deep pit on a piece of machinery to begin the fatal rescue attempt, thus allowing the summons to duty to issue and be received by Faur before the injury occurred.